UNITED STATES of America, Appellee,

v.

Philip Floyd TOLLIVER,
Defendant-Appellant.

Nos. 319 and 320, Dockets 77–1017
and 77–2055.

United States Court of Appeals,
Second Circuit.

Argued Nov. 1, 1977.

Decided Jan. 3, 1978.

Helena Pichel Solleder, New York City, for defendant-appellant.

Lee A. Adlerstein, Asst. U. S. Atty., Brooklyn, N. Y. (David G. Trager, U. S. Atty., Eastern District of New York, and Harvey M. Stone, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellee.

Before FEINBERG, OAKES and GURFEIN, Circuit Judges.

GURFEIN, Circuit Judge:

These are consolidated appeals by Philip Floyd Tolliver from (1) his conviction upon the verdict of a jury in the District Court for the Eastern District of New York (Dooling, J.), which found him guilty of the crimes of bank robbery by force or intimi-

dation (Count One) in violation of 18 U.S.C. § 2113(a) and (2) and of conspiracy to rob a bank (Count Three) in violation of 18 U.S.C. § 371; and (2) from the denial of his motion under 28 U.S.C. § 2255 to set aside the conviction on the ground that he was denied the effective assistance of counsel.

### The Government's Case

The evidence disclosed that on July 20, 1976 at approximately 9:15 A.M. two armed black men entered the Marine Midland Tinker National Bank in East Farmingdale, New York and robbed that bank of over $17,000 in currency. The robbers wore masks and had guns. They made their getaway in a green car bearing New York license plate number 852 MHT. James Zima, the Government's key witness, testified that at approximately 9:20 A.M. he was driving on Central Avenue away from the direction of the bank when his car was overtaken by a speeding green Pontiac. Zima saw the Pontiac come to a sudden stop on Central Avenue, at a point away from any buildings and adjacent to a cemetery. He then saw two black men quickly leave the Pontiac, run to, and enter a white Cadillac parked a few feet away. One of the men, who was carrying a large paper bag, got into the back seat of the Cadillac. The other man, later identified by Zima as codefendant Croft, sat on the passenger side of the front of the Cadillac.[1] As Zima passed the Cadillac, he observed the facial features of the driver—later identified by Zima as appellant. The Government's proof showed that the Cadillac was registered to appellant's wife.

Zima, his curiosity aroused, slowed his vehicle, allowed the Cadillac to pass and followed it until it made a turn in the direction of a residential neighborhood. Zima noted the license number and when he saw a Suffolk County police car, which had been alerted to the area, he reported what he had seen. A radio message was broadcast to police units describing the Cadillac

---

1. The getaway Pontiac, which had been stolen in Huntington, New York, on July 19, 1976, was found by Suffolk County Police at the precise location where the witness Zima saw the switch to the Cadillac.

and its license number. A few minutes later, a Suffolk County police officer observed the Cadillac traveling westward on the Southern State Parkway. The officer followed the Cadillac and, at approximately 9:30 A.M., stopped it. Croft and appellant were found inside. The third man was no longer in the car (and has not been apprehended). Also missing was the paper bag and its likely contents (a jacket worn by Croft during the robbery, the masks and guns, and the stolen money). In view of the times involved, the locations of the getaway vehicles were well within the normal driving possibilities of the bank robbers.

Appellant and Croft stated, in separate interviews, that they had been driving together that morning looking for a gambling game and had not been near the bank. The statements differed only in that at the crucial time of the bank robbery, 9:15 A.M., appellant stated that he and Croft had visited a particular gambling parlor in Wyandanch, while Croft denied that they had done so. The judge admitted the statements in evidence, having denied a defense request, made prior to the selection of the jury, that the defendants be severed for trial under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Judge Dooling ruled that the statements, which the Government sought to have admitted because of their falsity rather than their truth, were essentially interlocking and thus free of the difficulties underlying the *Bruton* decision. Neither defendant testified.

### The Suppression Hearing

At the suggestion of the trial judge, who invited the Government to test the Zima identifications, a pretrial line-up was conducted at the Suffolk County jail. Appellant was displayed to Zima as part of a six man line-up in the presence of appellant's counsel. Counsel did not object to the array or to the way the line-up was conducted. Zima was instructed by the prosecu-

tion, however, not to make any statement of identification at the line-up, and Zima's name was not disclosed to defense counsel. Zima was escorted from the line-up room and counsel was not permitted to be present when Zima was asked by the FBI agents and the Assistant U.S. Attorney whether he could identify anyone as the driver of the Cadillac. Counsel promptly objected to being excluded from the interview. This objection became the basis of a motion to suppress Zima's identification of appellant.

It later developed from the testimony at the suppression hearing (which was held just before the jury was empanelled) that after initially observing the line-up Zima was taken into a separate room and was asked if there was someone in the line-up whom he recognized. Both Zima and FBI Agent Sweeney, who was present during both the line-up and Zima's interview, testified that there was no indication given to Zima of which person in the line-up was Tolliver or even whether any of the defendants was in the line-up. At first, Zima stated that an individual who was not appellant looked to him most like the person he had seen driving the Cadillac, but he said that he was uncertain of the identification and wished to see all of the participants wearing sunglasses, since the driver had been wearing sunglasses at the time. Zima was not told whether he had picked out one of the defendants. He was taken back for a second view of the line-up, in which appellant was again included, and at which the participants alternately wore a pair of sunglasses. After again being escorted to a separate room, which defense counsel was not permitted to enter, Zima identified appellant by his number in the line-up, stating that the identification was now "beyond a benefit of a doubt."

After conducting a full hearing, Judge Dooling, while expressing reservations about the procedure that had been employed, found on the basis of the relevant cases that the procedure was not unlawful.[2]

---

**2.** The suppression hearing also dealt with the propriety of the decision, made by the FBI at the time appellant and Croft were stopped on

July 20, 1976, to bring Zima to view them. Judge Dooling found that the show-up identification procedure employed at that time had

### The Croft Guilty Plea

After the Government rested its case at trial, co-defendant Croft (who was represented by separate counsel) pleaded guilty to Count Two of the indictment, which charged him with placing lives in jeopardy during the bank robbery.

After Croft had pleaded guilty, appellant's counsel suggested, after a night's deliberation, that the judge inform the jury that Croft had pleaded guilty. The judge so informed the jury. Judge Dooling further instructed the jury that it was to disregard Croft's pretrial statement, which was no longer to be considered evidence in the case.

### The Line-Up Procedure

■ We consider first the line-up procedure. The issue posed is whether the exclusion of counsel from the room where Zima made his identification was an unconstitutional deprivation of appellant's right to counsel at a "crucial stage of the proceeding" and whether this should not have compelled the suppression of the Zima in-court identification. *See Moore v. Illinois,* ── U.S. ──, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977); *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *United States v. Ash,* 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973).

The Supreme Court has not yet passed on the precise question. In *Wade,* the Court held that a post-indictment line-up was a "critical" stage in a criminal proceeding and that the Sixth Amendment right of confrontation required the presence of counsel at the line-up. The Court said nothing about when a line-up ends, so that counsel need no longer be present. Cf. Fed.R. Crim.P. 44(a). It can be argued that a line-up is not finished until the witness has declared whether or not he can identify a particular person as the perpetrator of the

crime. *People v. Williams,* 3 Cal.3d 853, 856, 92 Cal.Rptr. 6, 8–9, 478 P.2d 942, 944–45 (1971) (4 to 3). On the other hand, it can be maintained that the purpose for which counsel must be present is essentially to see that the line-up procedure is itself adequate to avoid improper suggestion, such as the wearing of differentiating clothes, or a disparity in appearance between the other persons in the line-up and the suspect himself.

The Fourth, Fifth and Ninth Circuits have held that the "confrontation" ends when the defendant is no longer in the presence of the identifying witness, and that his identification may, therefore, be revealed in private to the prosecution, at least in the first instance, without the presence of defense counsel. *United States v. Cunningham,* 423 F.2d 1269, 1271–75 (4th Cir. 1970); *United States v. Wilcox,* 507 F.2d 364 (4th Cir. 1974), *cert. denied,* 420 U.S. 979, 95 S.Ct. 1408, 43 L.Ed.2d 661 (1975); *United States v. Banks,* 485 F.2d 545 (5th Cir.), *cert. denied,* 416 U.S. 987, 94 S.Ct. 2391, 40 L.Ed.2d 764 (1973); *Doss v. United States,* 431 F.2d 601, 603–09 (9th Cir. 1970).

In *Cunningham, supra,* Judge Winter reasoned that "[t]he rationale of these cases [*Wade, supra; Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)] is the potential intentional or unintentional suggestion inherent in the actual confrontation and the difficulty of establishing at trial by objective evidence the circumstances under which the line up proceeded." 423 F.2d at 1274.

We have put a similar gloss on *Wade, supra,* in the context of a post-indictment photographic spread rather than a physical line-up. In *United States v. Bennett,* 409 F.2d 888, 900 (2d Cir. 1969), we said that actual confrontation was the only "critical stage" requiring the presence of counsel,—a

been proper in view of the need of the FBI to know whether it had captured the right people. *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). Also covered at the suppression hearing was the question whether the statements of appellant and Croft were taken

in conformity with the requirements of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant has not, on this appeal, questioned the court's rulings in favor of the Government on these questions.

view later accepted by the majority in *United States v. Ash*, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973). Regardless of the valued holdings of the other circuits, we are bound, nevertheless, to give our own independent consideration to constitutional claims. *See United States v. Ash*, 149 U.S. App.D.C. 1, 9, 461 F.2d 92, 100 (1972), *rev'd on other grounds*, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973).[3]

We now join our sister circuits in holding that the actual identification from a *line-up* (as well as a photographic spread), if made outside the presence of the defendant, is constitutionally valid, since the actual confrontation is the only "critical stage" requiring the presence of counsel. *United States v. Bennett, supra*, 409 F.2d at 900.

We note, however, that the verbatim recording of the identification or failure of identification is so easy to achieve that it should be considered as an extension of the line-up, even though the "confrontation" feature ends when the defendant no longer faces the witness. There is no reason why the statement of the witness, even if not made immediately available to the defendant, should not be preserved and made available to defense counsel in time for a pretrial suppression hearing. See ALI, *A Model Code of Pre-Arraignment Procedures* § 160.4 (May 20, 1975). And even when videotape is not available, a tape recording machine is generally procurable without difficulty.

No recording was made here. We think this was error,[4] but, in the circumstances of this case, harmless error, as we shall see.

Our problem on this appeal goes beyond the problem faced by the Fourth, Fifth and Ninth Circuits. Those cases[5] did not deal with a refusal by the prosecution to let the defense know who the identifying witness was, nor did they involve a denial of access to him for pretrial interview, as was the case here.[6]

On the contrary, part of the rationale for holding that defense counsel need not be present at the moment of identification has been thought to be that the witness was made available to defense counsel for interview thereafter and, in any event, before the trial began. *See United States v. Wilcox, supra*, 507 F.2d at 367; *United States v. Banks, supra*, 485 F.2d at 548. In this case, the opposite procedure was followed. The witness was told not to say anything during the line-up while defense counsel was present, and defense counsel was not permitted to learn the identity of the witness until it was flushed out by means of the motion to suppress.

Discovery of evidence in criminal prosecutions is, inevitably, more restricted than discovery in civil cases. Thus, Fed.R.Crim. Proc. 16(a)(2) "does not authorize the discovery or inspection . . . of statements made by government witnesses or prospective government witnesses except as provided in 18 U.S.C. § 3500." In strict logic one may, of course, ask why, if the object of discovery is truth, it is not even more important to allow full discovery to a criminal defendant whose liberty is at stake. The conventional answers, which have stood the test of time, are that there is

---

**3.** Judge Dooling put the issue to counsel: whether "[T]he right to be represented persisted as long as the probability of improper suggestion persisted, and that persisted until the witness was on the record in your presence?"

**4.** We do not suggest that the finding of error for failure to make a recording would be retrospective in application to line-ups conducted before this opinion.

**5.** *See also United States v. Parker*, 549 F.2d 1217, 1223 (9th Cir.), *cert. denied*, 430 U.S. 971, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977). There, though appellant contended that his counsel was not permitted access to the witness who gave a private post-line-up interview to the

FBI, the court of appeals found no impropriety in the Government's conduct because "[t]he prosecutor merely requested the witness not to talk with defense counsel on the particular day on which he intended to re-interview them. . . . he was not impeded in interviewing the bank witnesses after the Government's re-interviewing."

**6.** Of course, when Zima testified at the pretrial suppression hearing, his identity became known to the appellant just before the hearing which directly preceded the empanelling of the jury.

more likelihood of the subornation of perjury by bribery or threat in criminal cases, and that where certain defendants who have been committed to a life of violence are involved, the danger to the safety of the witness outweighs total discovery as a *preliminary* requirement of fair trial. Cross-examination at the trial assisted by such modern aids as the Jencks Act, 18 U.S.C. § 3500, and the limited discovery provided by the Federal Rules of Criminal Procedure, have been thought to be weapons strong enough to prevent miscarriages of justice.

There is, to be sure, no way to prove the thesis. We may in fact, admit that the prevalence of violence in our social order has led to some weakening of the procedures available to defendants charged with crimes. In consequence, the pervasive fear for the safety of witnesses must, in some respects, adversely affect even the docile type of criminal defendant who would harm no one by physical violence. For example, until a generation ago, in New York State, the witnesses who testified before the Grand Jury had their names inscribed on the back of the indictment which was then handed to the defendant. Motions to inspect the Grand Jury minutes were often granted. These concessions to open prosecution were rescinded in thoughtful consideration of the safety of the witnesses.

In the end, there must be some ultimate reliance on the ethics of the prosecutor. In many cases, he will be present at a post-indictment line-up and the interview that follows. In any event, he should be. Concededly, there is some danger that misplaced zeal can, consciously or unconsciously, steer a witness to a desired identification. This danger can be averted, in large part, by requiring that the colloquy with the witness be taken down by a stenographer or preferably, recorded on tape, as we have indicated.

We are not unmindful, moreover of the obvious tension between the rule that prohibits the prosecutor from preventing access to witnesses known to defense counsel before trial, *see United States v. Hyatt*, 565 F.2d 229, 232 (2d Cir. 1977), and a rule permitting the prosecutor to hide the identity of his witnesses until the trial. The tension is rarely more acute than in the case of informants. Yet even in such cases, the disclosure of the identity of informants is hedged by balancing considerations. *Roviaro v. United States*, 353 U.S. 53, 62, 77 S.Ct. 623, 628, 1 L.Ed.2d 639 (1957). There the Court said:

"We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors."

There is, obviously, a difference between a secret informer and a good citizen like Zima who, by chance, is an observer of a crime. While the Government generally intends to keep an informer away from the trial and not make him a witness, it usually wants to produce the citizen bystander as a witness at the trial,—but only at the trial. The reason for recognizing the so-called "informer's privilege" of the Government is not merely to preserve the informant for unexposed recurrent employment, but also to protect his life. The latter consideration may be as true of an eyewitness to a crime of violence who, aside from the actual danger to his life if exposed early, may also, in such circumstances, die a thousand deaths before the trial, and come to see a menacing figure in every shadow.

 Even if a constitutional principle were involved, however, we could hardly suggest a neutral principle that separates the potentially violent defendant from others. It has always been the burden of the non-violent criminal to suffer from some of the restrictions imposed for fear of harm from the violent. Here the defendant was a participant in an armed robbery and escape. The third man was unapprehended

and at large. We can make no special rule for such a case, but the wisdom, indeed the necessity, for protecting identifying witnesses from harm must be a paramount consideration. We, accordingly, hold that the prosecution may withhold the identity of witnesses on identification, subject to the rules applicable to disclosure of prosecutorial evidence, and, generally, only if the interview after the line-up is recorded and preserved. We believe, moreover, that, before such withholding of identity by the prosecution upon a post-indictment line-up, a direction to permit such procedure should be obtained from the judge *ex parte* as a means of resolving the conflict between a defendant's need for evidence and the Government's claim of privilege based on a finding that the public security requires the withholding. *See In re Grand Jury Subpoena* (Edward Taylor), 567 F.2d 1183 (2d Cir. 1977) and cases cited. While such a direction was not obtained from Judge Dooling, and the identification interviews were not recorded, the error was harmless here. There can be no doubt that Tolliver was, indeed, the driver of the Cadillac, and the only exculpating evidence presented was defendant's pretrial statement that he was not involved in the robbery, which the jury declined to credit. There was no constitutional or other error in the line-up procedure followed, and even if the refusal to disclose the identity of Zima should be held to be error of constitutional magnitude, it would be "harmless constitutional error." *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *And see Moore v. Illinois*, —— U.S. ——, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977).[7]

### The § 2255 Appeal

■ Appellant contended that the errors of his counsel deprived him of his constitutional right to counsel. After a hearing, the District Judge denied the motion. The serious errors charged against trial counsel in the § 2255 proceeding were: (1) her failure to seek a mistrial when co-defendant Croft pleaded guilty at the close of the prosecution case; (2) her failure to call co-defendant Croft as a witness for appellant; and (3) her failure to cross-examine Zima concerning his inability to identify appellant when he first viewed him in the line-up.

The lawyer can hardly be criticized for failing to contest that Tolliver was in the white Cadillac, for she knew that the car belonged to appellant. In fact, it was referred to during the trial as "Mr. Tolliver's car." She also knew that appellant had admitted being with Croft on the day of the robbery. In that posture, to have tried to shake the identification by Zima, an apparently sturdy witness, might have been much riskier than arguing that, though Toliver was the driver, he did not know that he was driving a getaway car. As Judge Dooling noted: "I don't think an identification has much to do with the case anyway. I think it's an automobile identification or nothing."

Nor was it wrong for counsel to refrain from calling Croft as a witness after his plea of guilty. Although Croft maintained at the § 2255 hearing that he would have been willing to testify in appellant's behalf at trial, there was ample factual support for Judge Dooling's conclusion that Croft had not in fact evinced such willingness until he saw appellant in prison after convictions were entered. Clairvoyance is not expected to be an attribute of defense counsel. One could well suppose that a co-defendant, not yet sentenced, would hardly assume an exculpatory role without some signal emanating from his counsel. The selection of witnesses, is in any event, a matter of trial strategy which we are reluctant to second-

---

7. In reaching this decision we have put aside the circumstance that *after* trial in the § 2255 hearing, appellant admitted for the first time that he had, in fact, been in the white Cadillac at the time although he denied knowledge that a robbery had been committed. That admission rendered Zima's identification simply cumulative. We need not decide whether an admission *prompted* by an unconstitutional line-up would, in itself, amount to constitutional error. Here Tolliver's own pretrial statement admitted that he was with co-defendant Croft who was apprehended with Tolliver in the car.

guess. *See United States v. Yanishefsky,* 500 F.2d 1327, 1332 (2d Cir. 1974).

The argument that the trial attorney should have moved for a mistrial upon the acceptance of a plea of guilty from Croft has a surface appeal, but it is not convincing. Her colloquy with the court indicates a careful weighing of the alternatives by defense counsel. Since Tolliver was charged with aiding and abetting, the prosecution would have had to prove Croft's participation in the robbery in almost the same detail on a second trial. On the other hand, the emphasis of Tolliver's counsel that Croft's plea of guilty only confirmed Tolliver's defense—that Croft may be guilty but that Tolliver was not—may have been consistent and useful.[8]

With regard to the *Bruton* point, the Government had offered a statement by appellant and one by Croft. Each asserted that he had been with the other on a gambling expedition the morning of the robbery. Neither statement inculpated either himself or the other person in the robbery. There was no confession here, as in *Bruton,* nor any direct accusation of the other defendant. At most the statements established that the two defendants were *together.* The assertion of one was the admission of the other. The jury was instructed to consider the statement only against the declarant himself. Though there was discrepancy in the detail of where they were at the precise time of the robbery, this was far from a hearsay accusation of guilt. When Croft pleaded guilty, Judge Dooling properly instructed the jury to disregard Croft's statement. The conviction turned upon the identification, the finding of the first car and the surrounding circumstances. If it was error, it was harmless beyond a reasonable doubt. *United States v. Shaw,* 518 F.2d 1182 (4th Cir. 1975) (Robert P. Anderson, J.). *See United States v. Wingate,* 520 F.2d 309, 313–14 (2d Cir. 1975), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976); *United States ex rel. Stanbridge v.*

*Zelker,* 514 F.2d 45, 48–50 (2d Cir.), *cert. denied,* 423 U.S. 872, 96 S.Ct. 138, 46 L.Ed.2d 102 (1975); *United States ex rel. Nelson v. Follette,* 430 F.2d 1055, 1058–59 (2d Cir. 1970), *cert. denied,* 401 U.S. 917, 91 S.Ct. 899, 27 L.Ed.2d 818 (1971). Judge Dooling, who saw and heard the witnesses at the trial and at the post-trial hearing determined that appellant had not been inadequately represented by counsel. We agree that the conduct of defense counsel more than met even the liberal standard that "a defendant is entitled to the reasonably competent assistance of an attorney acting as his diligent conscientious advocate." *United States v. DeCoster,* 159 U.S. App.D.C. 326, 331, 487 F.2d 1197, 1202 (1973). *And see Rickenbacker v. Warden, Auburn Correctional Facility,* 550 F.2d 62, 67 (2d Cir. 1976) (Oakes, J., dissenting).

We have examined the other claims of error and find them to be without merit.

The judgment of conviction in 77–1017 is affirmed. The denial of the post-trial motion, 77–2055, is affirmed.

---

8. As Judge Dooling also noted, if Croft had testified on retrial that Tolliver was an innocent and unwitting chauffeur, it would have been difficult for appellant to avoid taking the stand himself. Had he done so, his prior bank robbery conviction would have been admissible as impeachment.