**UNITED STATES of America, Appellee,**

v.

**Charles WILLIAMS and Robert McGray, Appellants.**

Nos. 756 and 757, Dockets 77–1454 and 77–1501.

United States Court of Appeals, Second Circuit.

Argued March 20, 1978.

Decided April 6, 1978.

Albert J. Brackley, Brooklyn, N. Y., for appellant Charles Williams.

Gary R. Sunden, New York City, for appellant Robert McGray.

Zachary W. Carter, Asst. U. S. Atty., Eastern District of New York, Brooklyn, N. Y. (Mary McGowan Davis, Zachary W. Carter, Asst. U. S. Attys., Eastern District of New York, Brooklyn, N. Y., of counsel), for appellee United States of America.

Before KAUFMAN, Chief Judge, and SMITH and MESKILL, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

Charles Williams and Robert McGray raise a multitude of issues in seeking to overturn their convictions for armed robbery and for conspiracy to commit bank robberies. Having carefully reviewed the record, we find little merit in any of their host of contentions. Accordingly, we affirm. The convoluted facts underlying this appeal present a colorful exposition of the methods and manners of a troupe of bank robbers. We will traverse them in some depth so that the points of law will be placed in perspective.

I.

Sometime before early February, 1976, this saga began to unfold. During those early days, Curtis King was invited to the home of Ronald Bell to meet the appellants Charles Williams (a/k/a "Chaz") and Robert McGray (a/k/a "Sabu"). The visit was arranged to determine whether King had any experience or interest in the field of bank robbery. While King admitted that he was a novice, he evidenced a willingness to learn, and Williams and McGray were ready to conduct their graduate course in how to rob a bank. A series of lessons in the fine art of bank robbery followed.

King learned such vital facts as how to distinguish "wrap" money from "bait" money, the proper attire to be worn during "heists," and the significance of a "flip spot"—the place where one switches from a getaway car to a legitimate car. King also rehearsed his role. Stacks of papers were distributed throughout King's apartment, and King's agility was honed as he dashed to retrieve this pretended wealth.

Several weeks later, the group decided that the European-American Bank in Westbury, Long Island, would be the locus of their first robbery. McGray would act as "floorman," securing the bank by keeping everyone in check with a shotgun. It would also be his responsibility to time the robbery with a stopwatch and, at the end of sixty seconds, signal the robbers' departure with the command, "Race!". Bell, Williams and King would be the "countermen," whose task was to vault the teller's counter and retrieve money from the cash drawers. King was also instructed to assemble the necessary gear, including ski masks, gloves and guns. Gary Graham joined the group as the driver of the getaway car.

On the morning before the robbery, certain members of the coterie stole a four-door Plymouth to use as a getaway car. The automobile was then parked on a street in Long Island, in the general vicinity of the "target" bank. The following morning, meeting where the stolen car had been left the previous day, the five individuals proceeded, in the purloined car and three of their own vehicles, to the so-called "flip spot," an apartment complex located two minutes away from the bank. There, the group donned the clothing they would wear during the robbery, including ski masks, left their own cars on the apartment premises, and then proceeded to drive in the stolen car to the bank.

The robbery progressed according to the scenario. McGray first entered, wielding a shotgun, and told everyone to drop to the floor. King, Williams and Bell followed, vaulted the counter, and searched for the money. Ironically, King's extensive bank-robbing education seemed to have failed

him. He testified, and his story was corroborated by a bank teller observing the robbery, that he left empty-handed after a frantic search for funds. Williams and Bell were more successful, however, and managed to filch approximately $23,500. On McGray's command, the robbers then fled from the bank, and Graham transported his four cohorts to the apartment complex. There, they removed their "gear" clothing, stashed the money in a duffel bag, abandoned the stolen car, and proceeded to Brooklyn with their booty. Eventually, the group united at King's apartment, where each took his share of the loot.

Several weeks later, McGray called King from Chicago to determine whether King (or, perhaps, another member of the group) would be interested in another robbery. After a short conversation with Williams and McGray, and a subsequent discussion with Bell, King decided to join Williams and McGray in Chicago. Williams advised King that Theresa Jordan, William's girlfriend, would oversee travel arrangements. A few days later, Jordan and King flew to Chicago. Upon arriving at O'Hare Airport, the two were met by Williams and a man named Robert Hairston. The four then proceeded to the Hyatt Regency Hotel where Williams, assuming the alias "Louis McIntosh", had reserved several rooms. They were joined shortly by McGray.

During the next three days, the group scoured the area for a "suitable" bank, and finally settled on the Kilbourne State Bank. True to their tried *modus operandi*, Williams, McGray and King proceeded, on the afternoon of March 11, 1972, to the "flip spot," a driveway behind a house. There, they left their own car, and drove to the bank in a stolen brown American Motors Matador. Upon arriving at the bank, McGray "secured" the floor, and Williams and King proceeded to work behind the counter. A moment later, the three fled the bank at McGray's command with their spoils totaling $37,000. They then sped to the "flip spot", changing back into their street clothes en route. Abandoning the stolen car, the joint venturers drove to Chi-

cago where, in a room at the Hyatt Regency, the proceeds of the robbery were divided.

Following the Milwaukee robbery, King, Jordan and another woman flew back to New York, where Williams and McGray appeared to be headed for Atlanta. Upon King's return, he gave Bell and Graham, who had not even been in Chicago or Milwaukee, $2000 each from the proceeds of the theft in Milwaukee, ostensibly for their having been "on call." Exhilarated by their mounting success, the clique of robbers gathered to plan another robbery. In early March, after Williams and McGray had returned to New York, the group searched for a suitable bank, and a decision was reached to rob the Nassau Savings and Loan Association. On the evening before the robbery, King stole a brown Ford from a garage in Brooklyn, and the car was "positioned" for use the following day. The subsequent heist followed the traditional pattern. The group met at a parking lot behind several residential buildings, and proceeded to the bank in the stolen car. Once at the Savings and Loan Association, McGray "secured the floor," and Williams and King worked behind the counters. A moment later, the robbery was over, and the three men had taken off with almost $25,000.

Little progress had been made toward apprehending the robbers until November, 1976, when Curtis King was arrested for the hold-up of a Monticello, New York bank. About one month later, he commenced giving the federal agents information about the three robberies, and ultimately concluded an agreement with the government during January and February, 1977. In return for his testimony on the three robberies, implicating Williams, McGray, Bell, Graham and Hairston, King was promised concurrent sentence treatment for the Monticello offense, and leniency at sentencing.

Shortly thereafter, the government filed its five-count indictment. Count One charged Williams and McGray, together with King, Bell, Graham and Hairston, with conspiracy to rob a series of banks within the Eastern District of New York and elsewhere during the period January 1, 1976, to May 31, 1976. Counts Two and Three charged the two, together with King, Bell and Graham, with the February 9, 1976 robbery of the European-American Bank. Counts Four and Five charged them with the May 6 robbery of the Nassau Savings and Loan Association.

After the cases of Bell and Graham were severed and Hairston pleaded guilty, the trial against McGray and Williams commenced. At trial, the government relied heavily on the testimony of King since none of the employees at the three banks could identify any of the masked felons. In addition, the prosecution sought to corroborate King's testimony through an intricate web of circumstantial evidence. A series of observations spurring a chain of investigative events served, the government contended, to establish the identities of the three individuals who entered the Kilbourne State Bank on the afternoon of March 11, and to prove once again there is no perfect crime.

During the early morning of March 11, 1976, one Celia Dobberke, the wife of a Milwaukee police officer, observed four black males emerge from a blue car with a light top. One of the individuals subsequently re-entered the car and drove away. The remaining three proceeded to a brown four-door car parked nearby and they, too, sped away. Her suspicion piqued, Mrs. Dobberke jotted down the license plate numbers of both cars. At trial, Detective Thomas Langford of the Milwaukee Police Department testified that his investigation disclosed that the blue and white car was rented to one "Louis McIntosh." Caroline Timms, a rental car agent, testified that the brown car observed by Mrs. Dobberke was leased to a Ms. Sheila Duhart, and that the application listed Louis McIntosh as the second driver. These two automobiles were, the government's evidence suggested, the "legitimate" cars used by the group during their spree in Milwaukee and Chicago.

Later that same afternoon and a few minutes after the Milwaukee robbery, Er-

win Meyer observed three black men appear in the driveway behind his home. The group left the light brown Matador in which they had arrived,[1] and switched to a blue and white car. One of the men climbed into the trunk of this second car carrying a duffel bag, and the automobile sped off.[2] Meyer reported this strange incident to the police, and its investigation established that the Matador had been reported stolen a week earlier. The description of the blue and white car matched that given by Mrs. Dobberke to the police earlier that day.

Further links in the chain of identification were supplied by Gary Shaffer, a Michigan State Trooper, and Booker T. Brantley, president of a Lincoln-Mercury company dealership in Atlanta, Georgia. Shafer testified that, on March 5, 1976, he stopped a brown four-door car (the same automobile subsequently identified by Mrs. Dobberke), and arrested the driver for drunken driving. The driver, who identified himself as Abraham Williams, was taken into custody and photographed. The photograph was later admitted into evidence, and it turned out to be that of Robert McGray. Shaffer's testimony and the photographic identification were corroborated by William Bodziak, a document analyst for the Federal Bureau of Investigation, who testified that exemplars of McGray's handwriting and the signature "Abe Williams", appearing on the Hyatt Hotel Register, were of common origin. The passenger in the car identified himself as Louis McIntosh. While McIntosh was not photographed, Shaffer spoke to him at length, and subsequently identified him as Charles Williams.

Booker Brantley testified that, on March 12, the day after the Milwaukee robbery, a black man and a woman named Sheila Duhart inquired about the purchase of a Lincoln Continental. A rental agreement was arranged instead, and the leasing agreement was issued in Ms. Duhart's name. Brantley subsequently identified Charles Williams as the individual who produced $5000 from a brown paper bag to pay for the rental rights. In this fashion, the government corroborated the testimony of Curtis King.

Williams and McGray pursued two avenues of defense. First, they sought to impeach the credibility of King through cross-examination, and by the production of a witness, Alvin Scott, who testified that he encouraged King to get back at "Chaz" and "Sabu" because of festering resentments harbored by King against the pair. Second, both Williams and McGray questioned their identification as the bank robbers. The jury convicted both individuals on all five counts.

Williams was sentenced to 20 years imprisonment on Counts Two and Three, and to 25 years imprisonment on Counts Four and Five, the sentences to run consecutively. In addition, he received a five year concurrent sentence on the conspiracy count. McGray was sentenced to 20 years on Counts Two and Three, as well as on Counts Four and Five, with the sentences to run consecutively. He, too, received a five year concurrent sentence on the conspiracy count. Appellants are now incarcerated, and thus what could be a cinematic version of "The Anatomy of Bank Robbery" came to an end.

II.

A.

Williams and McGray, individually and collectively, raise a myriad of issues on appeal. Only several of their contentions require extended comment. First, the pair contend that the Government failed to establish a single conspiracy to rob banks and

---

1. This was not the same brown car observed by Mrs. Dobberke early that morning. Robert Hairston had apparently been driving the brown four-door to the "flip spot" when he noticed the police following him. In order to divert the police, he broke off from the rest of the convoy and, consequently, did not participate in the Milwaukee robbery.

2. King testified that he was the fellow who entered the trunk with the duffel bag. Fortunately, his cohorts "freed him" after forty-five minutes.

accordingly, some, if not all, of the evidence relating to the robbery of the Kilbourne State Bank in Milwaukee, which was set forth as an act in furtherance of the conspiracy, should have been excluded. They urge also that, if the Milwaukee robbery is viewed as a similar act, Judge Bramwell should have instructed the jury on that issue more extensively.

Our careful examination of the record discloses that there is more than ample evidence to support the jury's determination that a single conspiracy was established. A group of individuals were trained in the art of bank robbery, and each was assigned a specific function. It is clear that all were operating on the assumption—stated or unstated—that they would be available to perform their particular task whenever the need arose. Accordingly, Williams and McGray called King from Chicago to determine whether King or Bell was ready to "go to work" again. And it is of particular significance that upon King's return from Chicago, Bell and Graham, who did not go to Chicago or Milwaukee, received $4,000 from the proceeds of the Milwaukee robbery. That sum represented payment, not for any immediate efforts, but for their readiness to participate and continued availability. The existence of this gang and its scheme clearly sustained a finding of one conspiracy, and it is of little significance that different individuals of the same group with a common objective—to hold up banks—may have participated in the robberies. *See United States v. Cirillo*, 468 F.2d 1233, 1239 (2d Cir. 1972); *United States v. Stromberg*, 268 F.2d 256, 264 (2d Cir. 1959), *cert. denied*, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1960). *See also United States v. Edwards*, 366 F.2d 853, 867 (2d Cir. 1966). *See generally Developments in the Law: Criminal Conspiracy*, 72 Harv. L.Rev. 920, 927–28 (1959). We need not, accordingly, reach the question whether the evidence regarding the Milwaukee robbery was admissible as a "similar act" and whether the court's instruction in this regard was an appropriate one.

## B.

■ McGray and Williams also contend that questions posed by Judge Bramwell to their witness, Alvin Scott, had the effect of discrediting his testimony. While we have on many occasions instructed that trial judges be restrained in active participation on either side of a case, *United States v. Reed*, 526 F.2d 740, 743 (2d Cir. 1975), *cert. denied*, 424 U.S. 956, 96 S.Ct. 1431, 47 L.Ed.2d 361 (1976), *United States v. Nazzaro*, 472 F.2d 302, 309 (2d Cir. 1973), we have recognized that a trial judge has the authority to put inquiries where it is "necessary to clarify testimony and assist the jury in understanding the evidence." *United States v. DeSisto*, 289 F.2d 833, 834 (2d Cir. 1961). *See United States v. Natale*, 526 F.2d 1160, 1170 (2d Cir. 1975). Scott told a rather confusing and questionable tale of how he managed to learn that the person he knew as "Chaz" was on trial and that King was testifying against "Chaz." His testimony relating to the nature of King's grudge against "Chaz" and "Sabu" was also less than crystal clear. It was certainly permissible for Judge Bramwell to seek clarification on these points. While Judge Bramwell's further questions, regarding Scott's religious beliefs, were perhaps gratuitous, they were hardly prejudicial in context. Scott did commence his testimony by giving praise to Allah, and Judge Bramwell's inquiries suggested no bias whatsoever.

In any event, Judge Bramwell instructed the jury as follows:

if you feel that you have discovered by some stretch of the imagination what this Court thinks as to either some of the testimony or the case itself, you should remove that from your mind because I tell you here and now I have come to no conclusion in this case. . . .

As to the Court's questions to witnesses during the course of the trial. During the course of the trial I asked questions of a witness in order to bring out facts not fully covered in the testimony. Do not assume that I hold any opinion on the matters to which my questions may have related.

## C.

█ Williams contends that the identification testimony of Trooper Shaffer and Booker Brantley should have been excluded from evidence because of photographic spreads each witness had viewed long before the indictment of Williams had not been preserved. We agree that it is the better practice to preserve the spreads, *United States v. Tolliver*, 569 F.2d 724 (2d Cir. 1978). In this case, however, the failure to do so was not prejudicial. It is clear that the testimony of both Shaffer and Brantley was more amply corroborated. Accordingly, the likelihood of misidentification was significantly reduced. *See United States v. Reid*, 517 F.2d 953 (2d Cir. 1975) (identification testimony derived from the suggestive display of a single photograph allowed since "other evidence" connecting the defendant with the crime decreased the likelihood of misidentification).

## D.

█ Finally, McGray claims that his counsel, James Bing, an associate in the distinguished firm of Cravath, Swaine and Moore, who tried the case through his affiliation with the Community Law Office, was ineffective. He cites, as examples, a litany of his counsel's defects including waiver of an opening statement; ineffective cross-examination; tardy motions; and an inadequate summation. McGray notes that the trial was Bing's first attempt at criminal defense work, and that Bing should not have taken this burden before gaining some experience by acting as associate counsel.

While Bing was not the most experienced counsel at the criminal law bar, his performance neither was so deficient as to make the proceedings a farce and mockery of justice, *United States v. Wight*, 176 F.2d 376, 379 (2d Cir. 1949), *cert. denied*, 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586 (1950); *United States v. Bubar*, 567 F.2d 192, 202 (2d Cir. 1977), nor did it fall below the standard of the "reasonably competent assistance of an attorney acting as [a] diligent conscientious advocate." *United States v. DeCoster*, 159 U.S.App.D.C. 326, 331, 487 F.2d 1197, 1202 (1973); *United States v. Tolliver*, 569 F.2d 724, 731 (2d Cir. 1978). Many of the actions decried as incompetent were matters of trial strategy dictated by the fact that Bing conducted a coordinated defense with Anthony Lombardino, trial counsel for Williams and a former Chief of the Criminal Division of the United States Attorney's Office for the Eastern District of New York. For example, McGray complains that Bing only cursorily cross-examined King, but fails to mention that Lombardino cross-examined King for a full day and a half. Certainly, "second-guessing strategic choices is not the basis of relief for claims of ineffective counsel." *See United States v. Yanishefsky*, 500 F.2d 1327 (2d Cir. 1970).

Other actions by Bing, such as his tardy and unsuccessful application for production of a defense witness to discredit King, are not, to be sure, actions dictated by the demands of trial strategy. But, given the strength of the government's case against McGray, it is extraordinarily unlikely that McGray was at all prejudiced by his attorney's judgment. A convicted individual, particularly one who is incarcerated, has "ample opportunity to reflect with twenty-twenty hindsight upon the tactical errors of [his] attorney, and to point to those instances where a Clarence Darrow or even the defendant without counsel might have handled things a shade differently." *United States v. Garguilo*, 324 F.2d 795 (2d Cir. 1963). But we cannot fault Mr. Bing for his failure to have such vision.

Moreover, the following colloquy appears in the trial transcript:

Mr. Bing: I would like to put something on the record, your Honor.

The Court: Yes.

Mr. Bing: The reason why I am not cross-examining witnesses has almost totally been because my client felt that Mr. Lombardino was doing a very extensive cross-examination and there would be nothing to be added to it.

The Court: You acted under his direction?

Mr. Bing: Under his directions that I listened to him. I also concluded for the

most part Mr. Lombardino was very thorough and felt what I would add to it would not be very significant.

At the same time, it made my client happy.

The Court: That is the way your client wanted it?

Mr. Bing: Yes.

The Court: And that is what he instructed you to do?

Mr. Bing: Yes.

While we recognize that this colloquy occurred outside of McGray's presence, it nonetheless suggests that Bing, a conscientious member of the bar, was conducting the trial in a manner consistent with his client's wishes.

### E.

We have reviewed the other contentions made on appeal regarding accomplice testimony, the production of witnesses, the admissibility of prior statements, and the propriety of the sentences imposed. Finding those contentions to be wholly without merit, we affirm.