UNITED STATES of America,

v.

Robert L. BETHEA and Benjamin B. Banks, Defendants.

CR–80–00493.

United States District Court, E. D. New York.

Dec. 1, 1980.

Edward R. Korman, U. S. Atty., Eastern District of New York, Brooklyn, N. Y. by Gregory J. Wallance, Asst. U. S. Atty., Brooklyn, N. Y., for U. S.

Richard I. Rosenkranz, Brooklyn, N. Y., for defendant Banks.

Marion Seltzer, The Legal Aid Society, Federal Defender Services, Brooklyn, N. Y., for defendant Bethea.

## MEMORANDUM DECISION AND ORDER

SIFTON, District Judge.

This case is before the Court on a motion by the defendant Banks to suppress (1) evidence seized by the Federal Bureau of Investigation during the course of the investigation leading to this prosecution, (2) a post-arrest statement attributed to Banks, and (3) identification testimony by an eyewitness. The defendant Bethea has orally "joined in" these applications, which the Court takes to mean that Bethea seeks similar relief with regard to the evidence seized and with regard to post-arrest statements made by Bethea. The Government has stated that it will not offer an identification of defendants by the eyewitness to whose testimony the motion was addressed. There remain for decision the issues with regard to the seizures made from two trucks by the Federal Bureau of Investigation at and after defendants' arrest as well as several issues with regard to defendants' post-arrest statements.

■ The first issue raised by both defendants is whether there was probable cause to arrest them. I find that there was. The information on the basis of which the arrests were made included reliable information from reliable informants, corroborated both in its innocent and inculpatory aspects by personal observations of the arresting agents. *See Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). The information made it probable, although not certain, that defendants were knowingly in possession of valuable merchandise stolen from an interstate shipment. *See Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949); *United States v. Webb*, 623 F.2d 758 (2d Cir. 1980).

The information supplied by two confidential FBI agents was, it is conceded, second hand; that is, the informants do not appear to have personally observed the defendants in possession of the stolen merchandise. They do, however, appear to have reported information from someone with personal knowledge who was able to give a detailed description of the trucks containing the stolen merchandise and their location, capable of being tested by independent investigation. This is not a case, in other words, in which all the agents have is "a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." *Spinelli v. United States*, 393 U.S. 410, 416, 89 S.Ct. 584, 589, 21 L.Ed.2d 637 (1969). The fact that double hearsay is involved does not, in and of itself, negate probable cause. *United States v. Fiorella*, 468 F.2d 688, 691–92 (2d Cir. 1972), *cert. denied*, 417 U.S. 917, 94 S.Ct. 2622, 41 L.Ed.2d 222, *reh. denied*, 419 U.S. 885, 95 S.Ct. 156, 42 L.Ed.2d 128 (1974); *cf. United States v. Marcello*, 570 F.2d 324 (10th Cir. 1978).

The reliability of the confidential informants' information is also strengthened by the reliability of the informants. One of the informants had worked for the Bureau for close to a decade and had supplied information leading to ten convictions as well as to the recovery of substantial amounts of stolen merchandise. The other informant, of more recent vintage, had also contributed to the recovery of substantial amounts of merchandise stolen from interstate commerce. The information supplied by each informant was corroborative of the information supplied by the other, since the information was substantially identical. Each informant's information was, to a large extent, corroborated by the agents' surveillance. The trucks were found where it was stated they would be. The description of the trucks proved accurate. The trucks were in the hands of a black crew, as predicted. Most significantly, the actions of the defendants after they became aware that they were being watched and after they were notified to stop gave basis for an inference that defendants knew that they were in possession of stolen merchandise. The agent following the defendants arrived at the conclusion that they had seen him and were attempting to flee. This impression was confirmed when the agent pulled up alongside the truck in which the defendants were moving and signaled to the

watching Bethea to stop, using lights, sirens, and hands, without success. *Cf. United States v. Baltazar*, 477 F.Supp. 236 (E.D. N.Y.1979).

Defendants argue, however, that, even if the arrests were proper, the search of the two trucks was not. There is a substantial question as to whether defendants have standing to complain of these searches. In all events, the search of the truck in which the defendants were moving when arrested appears proper, since it was made with defendants' consent. The other vehicle was properly seized and its open areas searched under the so-called "automobile exception" to the fourth amendment. *United States v. Ochs*, 595 F.2d 1247 (2d Cir.), *cert. denied*, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979). The later search of the back of the vehicle appears justified as an inventory search required to be conducted in order to avoid spoilage to the frozen meat which the truck was believed, with justification, to contain. *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976).

■ With regard to the U-Haul truck, the question of standing appears fairly straightforward. The truck was, according to Bethea's post-arrest statement, rented by him for another, unknown individual who asked Bethea to rent it for him, since the other individual lacked a driver's license. This accommodation by Bethea could not have created a reasonable expectation of privacy on Bethea's part in the contents of the truck. *See United States v. Coats*, 611 F.2d 37 (4th Cir. 1979). The fact that Bethea thereafter drove the truck to various locations for his unknown acquaintance, even if enough to establish standing while the truck was in Bethea's possession, *compare United States v. Ochs, supra*, 595 F.2d at 1253 n.4, *with United States v. McGrath*, 613 F.2d 361 (2d Cir. 1979) (at least as to

those parts of the truck to which he had access), does not appear sufficient to establish standing after Bethea had driven the truck to the location to which the unknown acquaintance had instructed it be driven and after Bethea had, thereafter, left the truck behind at that location. Even assuming that Bethea retained the key to the ignition of the U-Haul and did not simply leave the keys under the mat—a question not resolved by the evidence—his permission to use the truck was limited, if not at an end.[1] Bethea's access to the locked box of the truck was, in all events, prohibited, since he did not have in his possession any key to the locked box of the truck. *Cf. United States v. Ochs, supra*, 595 F.2d at 1253.

■ Banks' claim of standing to complain of the search of the U-Haul has no basis in the evidence since, according to both his own statement and Bethea's, Banks had no interest at all in the truck.

■ Whether the search and seizure of the U-Haul without a search warrant was justified is a closer question. Clearly, there was probable cause to believe the truck contained stolen merchandise. However, unlike the Cadillac at issue in *Ochs, supra*, the U-Haul was not in the possession of the defendants, it was not illegally parked, and it was not on a busy street at rush hour. There was, in other words, less basis for concern in this case than that which existed in the passage from *Chimel v. California*, 395 U.S. 752, 764 n.9, 89 S.Ct. 2034, 2040 n.9, 23 L.Ed.2d 685 (1968),[2] on which the *Ochs* court relied to authorize the search of the Cadillac. Nevertheless, according to both defendants' statements, a third party was expected to arrive momentarily to pick up the U-Haul. In fact, his arrival was overdue. If seizure was permissible if another appeared to claim the vehicle, there appears

---

1. The car was overdue under the rental contract.

2. "Our holding today is of course entirely consistent with the recognized principle that, assuming the existence of probable cause, automobiles and other vehicles may be searched

without warrants 'where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.' *Carroll v. United States*, 267 U.S. 132, 153 [45 S.Ct. 280, 285, 69 L.Ed. 543]."

little reason to say that seizure was not appropriate at once. *See United States v. Ochs, supra,* 595 F.2d at 1253.

Once seized, it is clear that the truck was appropriately searched for inventory purposes. Implicit in the inventory process is not only the determination as to what has been taken into custody, but also the assumption of some degree of responsibility for the care of that which has been seized. *South Dakota v. Opperman, supra,* 428 U.S. at 378, 96 S.Ct. at 3101. The contents of the cab of the truck was carefully catalogued to determine what had been taken. The contents of the locked box was inventoried and removed to a refrigerated location, since the agents had every reason to believe that they had taken into custody frozen meat which would spoil. Thus, even assuming defendants have standing to complain of the search of the U-Haul, the search of the truck was proper. Accordingly, so much of defendants' motions as seeks to suppress evidence of the rental contract and toll receipts recovered from the cab of the truck and of the boxes of meat found in the back of the truck is without merit.

With regard to the truck in which defendants were located when they were stopped—the so-called C&M truck—defendants standing is, likewise, questionable. According to Bethea's post-arrest statement, the truck was owned by his employer who lent it to Banks, who then let it be used by an unknown third individual, who asked that it be left with the U-Haul at a specified location in Staten Island. Neither Bethea nor his companion, according to both defendants, had access to the locked box in which the meat was recovered. While Bethea was a passenger in the car at the time it was stopped, this fact alone is insufficient to establish a legitimate expectation of privacy under *Rakas v. Illinois,* 439 U.S. 128, 134, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978). Nor does there appear to be any reason why Bethea's status as an employee of the owner of the truck or as a person who had driven the truck in the past

would establish the kind of expectation of privacy referred to in *Rakas.* The only pieces of property found in the truck connecting Bethea with it were two Exxon credit card receipts in his name. The presence of these receipts in the truck is consistent with Bethea's presence in the truck as an employee, but not, in and of itself, sufficient to establish an expectation of privacy on Bethea's part, particularly as regards the locked box in which the stolen meat was found.

The question of standing with regard to Banks as the driver of the C&M truck is closer. *Cf. United States v. McGrath, supra, with United States v. Ochs, supra,* 595 F.2d at 1253 n.4. Banks, according to both his own account and that of Bethea, had, moreover, sufficient power over the C&M truck to rent it to another individual, Hurst; and although Hurst returned the truck with its box locked, even as against Banks, that fact should not destroy a reasonable expectation of privacy on Banks' part as a result of Banks' possessory interest in the truck both before it was rented out and after it was returned.

■ Both defendants appear, however, to have voluntarily consented to the opening of the C&M truck.[3] Consent was consistent with the defendants' position assumed from the start that they did not know why they were stopped, that they did not know what was in the truck, that they did not have access to the truck's locked box, and that they had no papers on the truck's contents. Both men volunteered keys, saying they did not know if the keys would work—Banks by cocking his hip to show the pocket in which he had put the keys to the truck, Bethea by saying there were keys on the dashboard. Only after the unsuccessful attempt to use the keys were the men asked if they would object to the locks being broken off. At the time of this consent, both men had been given their *Miranda* warnings, although no warning concerning their rights, if any, to insist on the issuance of a search warrant was given. Although

---

**3.** According to one FBI witness, Banks consented while Bethea "had no objection," which is consistent with the evidence as to their differing interests in the truck.

they had been stopped at gun point and were handcuffed, both men are mature and appeared calm. The fact that no written consents to search were requested or obtained does not negate voluntary consent, nor does the absence of an advice of rights. On all of the facts, I see no basis for finding that the wills of these two men were overborne by the agents or that the defendants' agreement to let the truck be inspected was anything less than an intelligent waiver of such privacy expectations as the defendants might have in the truck's contents.

For the reasons set forth above, defendants' motions to suppress the evidence derived from the search of the two trucks, namely, Government Exhibits 12 (a meat carton), 14, 15 and 16, (photographs of the contents of the trucks) 7, (the U-Haul rental contract) and 13 (a Goethals Bridge receipt) are denied.[4]

■ I turn, next, to the post-arrest statements sought to be proved at trial, namely, the lengthy explanations given shortly after their arrest by both defendants and a shorter statement by the defendant Bethea that his earlier statement was a lie, which he wanted to correct. I conclude that the admission of the statements is proper, provided each defendant's immediate post-arrest statement is redacted to eliminate references to the co-defendant. *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

The immediate post-arrest statements include (besides some innocuous statements which are presumably not objected to, *viz*, "What's going on?" and a request by Banks for his jacket): (1) statements by both defendants in each other's presence in response to questioning to the effect that they did not know what was in the truck, did not have any "paper work" for the truck's contents, and were not sure if their keys would open the truck's lock, and (2)

statements made by each defendant after being separated from the other. Each of these statements, I find, was made immediately after complete warnings of the type required under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and following an intelligent waiver by defendants of their rights to silence. I further find that the statements were voluntarily made within the meaning of 18 U.S.C. § 3501, taking into account all of the circumstances including the factors required to be considered under that section.

Banks was warned of his rights by the arresting agent immediately following his removal from the truck at gun point and his being cuffed. He said he understood them. He was also told immediately that the agents believed he had a truckload of stolen meat. Once Banks had been cuffed, the gun was holstered. Following Banks' effort to engage in colloquy ("What's going on?"), he was cut off, giving him time to reflect on his situation and his rights.

Bethea was warned by the agent who pulled him from the passenger side at gun point and who cuffed him immediately after he was cuffed and patted down. Bethea indicated by nodding his head that he understood.

Both men were then taken to the front of the truck where they were asked if they knew what was in the truck and if they had papers or keys to the back. The defendants both responded that they did not know the truck's contents, did not have papers, and that they did not know if the keys, which they offered to let the agents try, would work.

Following an unsuccessful effort to open the back of the truck with the keys, the defendants stated that they had no objection to the back of the truck being opened by the agents. After the truck was opened

---

4. In addition to the above items of physical evidence, two bridge crossing receipts were recovered from the defendants' persons. Government Exhibit 10 was produced in response to a question during Bethea's interrogation, and its acquisition by the Government was proper because, under the circumstances described in connection with the defendant's statement, the Government's access to it was consented to. Another bridge receipt, Government Exhibit 11, was produced and seized at the time defendant Banks' personal property was being properly inventoried incident to his arrest.

and the beef found, defendants were advised that they would be charged with possession of goods stolen from an interstate shipment and again advised of their rights, which they again stated they understood. The defendants, still handcuffed, were then separated and seated in different government cars, each with two agents in the front seat and the defendant alone in the back seat. Each was warned again for a third time. Bethea read the warnings to the agent from a written form. Banks heard the warnings read to him by the agents. When Bethea stated he didn't understand the word "coercion," which appears on the form in the phrase, "No pressure or coercion of any kind has been used against me," it was explained by the agent. Each defendant was asked if they waived their rights and said they did. Banks was asked to sign the form and did, although he was handcuffed. Bethea did not because the agent who was with him thought he couldn't or shouldn't be asked to sign with cuffs on.

However, apart from issues related to the voluntariness of the two post-arrest statements set forth in Government Exhibits 3500–11 and 3500–24, their admission in a joint trial of both defendants poses other problems.[5] Each defendant's statement, in addition to portraying the manner in which the "confessing" defendant came in contact with the two trucks, also refers to contacts between the two defendants.

The Government justifies its proposal to use both statements without redaction, first, by saying that it is offering the statements not for their truth, but as false exculpatory statements and that, therefore, defendants' rights of confrontation are not in issue. Secondly, the Government argues that these are interlocking "confessions" admissable under the doctrine relied on in

such cases as *United States ex rel. Standbridge v. Zelker*, 514 F.2d 45 (2d Cir.), *cert. denied*, 423 U.S. 872, 96 S.Ct. 138, 46 L.Ed.2d 102 (1975); and *United States ex rel. Ortiz v. Fritz*, 476 F.2d 37 (2d Cir.), *cert. denied*, 414 U.S. 1075, 94 S.Ct. 591, 38 L.Ed.2d 482 (1973). Dealing with these arguments in reverse order, the theory of the interlocking confession cases is essentially one of harmless error. If the major elements of the crime are confessed by both defendants, there is little harm in having a co-defendant's confirmation of the defendant's responsibility. *See Parker v. Randolph*, 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979). Here, there is no confession of any of the elements of the crimes charged in the indictment except, perhaps, possession. To the extent that the defendants admit their own possession of the trucks as well as point to possession by a co-defendant, the statements confirm each other. However, since the Government proposes to offer the statements not on that element, which is, in any event, virtually undisputed, but rather on the issue of state of mind to show knowledge of the fact that the merchandise was stolen, it would appear vital for each defendant to be able to cross-examine and confront the other in order to rebut the inference that the defendant's own post-arrest statement concerning possession was false because it appears to conflict with the statement of the other defendant on the same subject.

While the Government argues that the statements do not inculpate and are not vitally important to its case, relying on *United States v. Wingate*, 520 F.2d 309 (2d Cir. 1975), the issue of knowledge in this case is central; and if these post-arrest statements are accepted by the jury as false because a defendant's account of his own

---

**5.** Defendants did not include in any pretrial papers a request for a severance or redaction of the post-arrest statements pursuant to *Bruton*. Their failure to do so is, however, understandable in view of the cryptic description of the defendants' statements given in the Government's disclosure letters of October 2, 1980, which failed to point out that each defendant's statement referred to the other defendant.

While the disclosure letters referred to the availability of summaries of the statements to the defendants, they were apparently not picked up until the date of the hearing. In all events, waiver of defendants' rights to confront each other with regard to these post-arrest statements is not something to be lightly inferred.

dealings with the trucks differs from his co-defendant's version, the statements will be extremely inculpatory. In this case there is no reason to believe that the inconsistencies between the two co-defendants' statements will be "merely cumulative on the issue of defendant's credibility" because of "overwhelming adverse evidence given by witnesses who were subject to cross-examination" as in *United States v. Shaw*, 518 F.2d 1182, 1183 (4th Cir. 1975) (Anderson, C. J.). Nor is there a basis for equating this case with *United States ex rel. Nelson v. Follette*, 430 F.2d 1055 (2d Cir. 1970), in which the co-defendant's statements "were so clearly at odds with all other versions of the incident that it is quite possible that the jury disregarded them entirely." Nor is there here the possibility that the admission of both confessions would be "harmless beyond a reasonable doubt" as in *United States v. Tolliver*, 569 F.2d 724, 731 (2d Cir. 1978), since in this case a prominent feature of the Government's proof of the defendant's knowledge will be the falsity of their post-arrest statements and the means most ready to hand of proving that falsity will be a contrast between the two defendants' accounts of each other's conduct. No instructions which this Court can conceive of (and none have been suggested to it) could substitute for effective cross-examination in persuading the jury to consider each defendant's statement only with regard to the case of the defendant making it, *even* when the other defendant is referred to.

The Government's other argument must, likewise, be rejected. Although the Government is prepared to disown both statements and call them both inaccurate, such a stance in no way lessens the need of both defendants to cross-examine the other to establish, if it can be done, that the apparent inconsistencies between each defendant's description of his own activities and the description of the same activities by the co-defendant are not, in fact, inconsistent. Beyond that, in at least two respects, the statements are not only inculpatory of each co-defendant because they contradict his own description of his role, but in a more direct fashion. Thus, the defendant

Banks in his statement says he was paid a lower price for his role in securing a truck than Bethea, suggesting a possible awareness on Bethea's part of the illegal nature of the venture not shared by Banks. Bethea, on the other hand, in his statement places Banks and an unknown third party in possession of the two trucks for a substantial period of time without Bethea being present, putting Banks in a position of appearing to be more involved than Bethea. Admission of both statements at a joint trial without redaction would deprive both defendants of a right of confrontation on these matters.

The solution to this situation is either severance or redaction. *United States v. Trudo*, 449 F.2d 649 (2d Cir. 1971), *cert. denied*, 405 U.S. 926, 92 S.Ct. 976, 30 L.Ed.2d 799 (1972); *United States v. Bujese*, 434 F.2d 46 (2d Cir. 1970), *cert. denied*, 401 U.S. 978, 91 S.Ct. 1208, 28 L.Ed.2d 328 (1971). The Court has prepared a redacted version of the statements (Government Exhibits 3500-11 and 3500-14) which eliminates from Banks' statement all references to Bethea or "Bethune," as he is there called, and to the U-Haul truck and which eliminates from Bethea's statement all references to Banks and the C&M truck. While it might be possible to come up with a different redaction, that proposed seems reasonable and avoids the problems by a redaction which would leave it open to the jury to infer what each defendant said about the other. *Cf. United States v. Danzey*, 594 F.2d 905, 917-18 (2d Cir. 1979).

Finally, defendant Bethea's statement, said to have been made June 6, 1979, following his arrest, to the effect that he had lied and wanted to correct his earlier statement, does not, in the circumstances, require suppression. Bethea had been given warnings three times the previous day and had had opportunity for reflection. While one must weigh against this the coercive effects of an overnight incarceration as well as the agent's own assessment of the situation that "it is inappropriate that I talk to you at this point," the Court is persuaded that the statement was volun-

tary and resulted from another intelligent waiver of the defendant's rights. The agent's assessment appears based on the agent's uncertainty as to whether an attorney might have been already retained to represent the defendant. The defendant's maturity and opportunity for reflection outweigh the coercive effect of the overnight detention. The delay in arraignment was reasonable, because of the late hour at which defendants were arrested and the need for their assistance, which they willingly gave, in bringing the trucks to a place where their contents could be refrigerated.

Defendants' motions to suppress are, accordingly, denied, except as set forth above.

The Clerk is directed to mail a copy of the within to all parties.

SO ORDERED.