UNITED STATES of America

v.

Jose Manuel BALTAZAR, Beatrice Lopera, Alexandra Escobar, Luis Tobon Gonzalez, and Jesus Espinal, Defendants.

No. 79 CR 146.

United States District Court, E. D. New York.

Decision June 25, 1979.

Memorandum and Order Sept. 6, 1979.

PLATT, District Judge.

Defendant, Jose Manuel Baltazar, has moved to suppress the fruits of a warrantless search, seizure and arrest executed on March 5, 1979 by New York City detectives. Defendant and four other persons arrested at the same time and location, Beatrice Lopera, Alexandra Escobar, Luis Tobon Gonzalez, and Jesus Espinal, were indicted in federal court for violating Title 21, United States Code Section 841(a)(1) and Title 18, United States Code Section 2, possession with intent to distribute one hundred seventy-eight (178) grams of cocaine hydrochloride, a Schedule II narcotic drug controlled substance. All five defendants moved to suppress all items seized from, and all statements made by, them at the time of their arrest on the grounds that the same were obtained in violation of defendants' constitutional rights. Pursuant to these motions, a hearing was held on April 20, May 3, May 4 and May 24, 1979.[1] Although Jose Manuel Baltazar is now the only defendant in this case who has not pled guilty or against whom the indictment has not been dismissed,[2] an analysis of the legal issues raised by his motion, and in particular the question of defendant's standing to have evidence suppressed, requires a rather detailed summary of the testimony received at the hearing.

I

## THE SUPPRESSION HEARING

The Court heard testimony from four witnesses: Detective Thomas Healy of the New York City Police Department; Special Agent Richard K. Crawford of the Drug Enforcement Administration; and two Spanish language interpreters, Jack Trabout and Manuel Ras, called by defendants.

Detective Healy testified that as a member of the Queens Homicide Task Force he

E. R. Korman, U. S. Atty., E.D.N.Y. by Harvey J. Golubock, Asst. U. S. Atty., Brooklyn, N. Y., for United States.

Marion Seltzer, Legal Aid Society, Brooklyn, N. Y., for defendants.

1. The hearing dates set forth above were scheduled at the request of defense counsel to accommodate their prior commitments to other criminal cases.

2. See below at 243.

had been assigned to investigate a double homicide that had occurred in Queens on October 18, 1978 (Tr. 12–13, 103, 109, 113, 116–118, 148).[3] In late January or early February of 1979, Agent Crawford, a member of Group Five of the Drug Enforcement Agency's ("DEA") New York Joint Task Force, informed Det. Healy that a visit to an apartment located at 2534 Crescent Street in Astoria, Queens, might prove useful in the latter's homicide investigation (Tr. 105, 120, 303, and 319–320). Having learned that certain individuals he wished to interview "had at one time or other stayed at that apartment in Astoria" and that one of the two deceased had been "a frequent visitor" there (Tr. 109 and 113), Det. Healy went to the Crescent Street address on February 27, 1979 and was let into the apartment by the building superintendent. The apartment had been abandoned but, after rummaging through garbage he found "a memo book or a little memo pad" which contained the address of an Apartment 6D located at 88–10 178th Street in Queens (Tr. 104–109, 119–120, 125, 127–130, 158, 238).

On March 4, 1978 (Tr. 161), Detective Healy went to the 178th Street address where he spoke to the building superintendent. The superintendent thought that "at least two males and two females" were living in Apartment 6D, but he did not know their names (Tr. 153–156). He had a floor plan or a list of all the apartments which associated the name Guttierez with Apartment 6D (Tr. 285–286). Detective Healy consulted the building directory; although he could not remember at the hearing the name listed for Apartment 6D, he

did remember that it was not Guttierez. He did not check for a name on the mailbox (Tr. 153–156). Presumably in order to learn more about the occupant or occupants of Apartment 6D, Det. Healy proceeded that same day to the premises of the Famma Realty Corporation where he requested a copy of the lease for that apartment and was given an application for a lease on the apartment. It dated from December, 1978, listed as the prospective tenant one Severinno Gutierrez, and was signed by one Beatriz Valasquez Gutierrez[4] (Tr. 15–16, 156–157, 159–163, 181–186, 285). Detective Healy testified that the "person at the realty [company] could only recall that it [the applicant for a lease] was a male and that the person [Gutierrez] spoke Spanish and the person in the realty office thought that the person was from Colombia" (Tr. 157).

Sometime around nine o'clock in the evening of the following day, March 5, 1979 (Tr. 187), Detective Healy and three fellow police officers (Tr. 152, 236) returned to the 178th Street address to interview the occupant or occupants of the apartment listed in the notebook found in the abandoned Crescent Street apartment (Tr. 16, 177, 187). Det. Healy spoke to the building superintendent again (Tr. 163) and either on this occasion or during their meeting of March 4th the superintendent indicated that the occupants of Apartment 6D were Spanish-speaking persons from Colombia and "roughly stated their ages and complexions and builds" (Tr. 178). One of the superintendent's descriptions matched the description of an individual sought by Det. Healy in connection with his homicide investigation (Tr. 177–179, 238).[5] In order to deter-

---

3. . The numbers in parentheses (Tr. 12–13) refer to pages in the stenographic transcript of the suppression hearing.

4. When Detective Healy first mentioned at the suppression hearing the name of the tenant listed on the lease application for Apartment 6D, he spelled it for the court reporter "S-e-r-v-e-r-i-n-o G-u-i-t-t-e-r-e-z" (Tr. 15). However, elsewhere in the transcript it is variously spelled "Severino Guitterez" (Tr. 17) and "Severino Guttierez" (Tr. 162 and 175). The spelling used by the Court in this opinion, "Severin-

no Gutierrez", is that found on the lease application.

5. In response to further questioning by defense counsel, Detective Healy stated that one of the persons actually arrested that day, one of the defendants, also fit the description pertinent to the homicide investigation (Tr. 178). Defense counsel then inquired which defendant that was. The prosecutor objected to the question on the grounds that it probed into an unrelated criminal investigation and that an answer would jeopardize the New York City Police Department's ongoing homicide investigation.

mine the likelihood that somebody would actually be in the apartment at that time, Det. Healy went to the garage and found a car in the space leased to Apartment 6D (Tr. 164–165).

As Detectives Healy and Fasullo took the elevator to the sixth floor, Detective Hudson stationed himself outside the building on the street below the windows of Apartment 6D and Detective Alleyne proceeded up the stairs and stationed himself on the sixth floor landing in the stairwell (Tr. 167–168; 171–172). Upon reaching the sixth floor, Det. Healy, accompanied by Det. Fasullo (Tr. 16, 171, 192), proceeded to Apartment 6D "listened for a second" at the apartment door but heard nothing (Tr. 192–193), and knocked on the door. He testified that he heard a female voice from within the apartment "but . . . couldn't make out what she was saying." (Tr. 16, 171, 193). Detective Healy then uttered the name on the lease application: "Severinno, Severrino Gutierrez" (Tr. 17, 193, 193a). Defendant Beatrice Lopera then opened the door halfway or a little more than halfway (Tr. 18, 194). This permitted Det. Healy an unobstructed view (Tr. 197) into the living room of the apartment. He could see a couch located approximately twenty-five to thirty feet from where he stood, placed up against the wall to his left and positioned in a manner perpendicular to the doorway (Tr. 19, 197–198, 255–256). In front of and parallel to the couch was a coffee table (Tr. 18, 100–102). A brown leather handbag was on the coffee table (Tr. 19, 21, 29). On the other side of the coffee table and facing the couch were two easy chairs (Tr. 18, 100–102, 255). When Miss Lopera opened the door, Det. Healy observed three other persons in the apartment. Defendants Alexandra Escobar and Jose Manuel Baltazar were seated on the couch, Miss Escobar being positioned closest to the door (Tr. 18, 20, 32, 255, 277–278); defendant Luis Tobon Gonzalez was seated in the easy chair closest to the door (Tr. 18, 32, 255, 277–278).

The Court allowed defense counsel to put this and other questions on the record and, after questioning Det. Healy on the record but *in camera* with respect to these specific inquiries, the Court determined that answers to the ques-

On direct examination, Detective Healy testified that when defendant Lopera opened the door he displayed his detective's shield in his left hand and said: "I am a police officer. Where is Severinno Gutierrez?" (Tr. 17, 195–199). On cross-examination, he testified that he first repeated the name Severinno Gutierrez and then displayed his shield saying: "Police—policia" (Tr. 195–196). As he spoke, Miss Lopera began backing away from the door (Tr. 19, 195–196). Detective Healy did not move his feet, walk towards Miss Lopera or touch the door (Tr. 196–197), but when she did not respond he repeated the name Severinno Gutierrez (Tr. 18, 194–195).

At this time, Detective Healy observed Mr. Baltazar, who was seated approximately twenty-five feet away at the far end of the couch, "come forth off the couch and reach his right hand behind the brown leather bag" (Tr. 20, 21). Det. Healy testified that the bag was so positioned on the coffee table that he could not see what the defendant was reaching for (Tr. 20–21, 198) and testified that

"I got aroused, I thought he may be reaching for an arm, a pistol.

\*    \*    \*    \*    \*    \*

"I watched him intently and I went to my pistol, I had my pistol on the right side, I let go of the safety release on the holster, and I had it in my hand and I took the gun halfway out of the holster." (Tr. 22)

When Mr. Baltazar's hand came back into view from behind the leather bag, he was holding by its tip "a clear plastic bag containing white powder" (Tr. 22, 198). Detective Healy testified that he saw Mr. Baltazar take the glassine bag containing white powder and place it "inside his coat in the area of his left armpit" (Tr. 23, 194, 196, 198, 339, 361–362).

tions could jeopardize an ongoing criminal investigation and sustained the Government's objections (Tr. 115–116, 118, 128–130, 178–181, 187, 191, 212, 218–219, 220–226 (sealed), 227, 233, 251).

Detective Healy testified that based on his experience [6] he then believed the glassine bag secreted by Mr. Baltazar to contain cocaine (Tr. 23–24). He stated to Detective Fasullo, who was standing to his right: "Joe, there's coke" (Tr. 24) or "Gee, it's coke" (Tr. 199). Det. Healy then entered the apartment "walking rapidly." [7] As he neared the coffee table, he noticed that the brown leather handbag was open and contained money (Tr. 29). He displayed his shield which was still in his left hand and he still had his right hand on his pistol in his holster. As he approached the people in the living room he repeated "Policia, policia, policia" and as he approached Mr. Baltazar he motioned that Mr. Baltazar (who presumably had resumed his seat on the couch) should stand and said "Stand up, ariba, up" (Tr. 24–25, 198–199, 263).

As Mr. Baltazar rose from the couch, Detective Healy replaced his shield in his left pants pocket and reached underneath Mr. Baltazar's coat, into the area of his left armpit, retrieved the clear plastic bag (Tr. 25–26) and confirmed his initial visual observation. Detective Healy then informed the four occupants of the apartment that they were under arrest (Tr. 30, 275–276). He noticed that Miss Lopera and Det. Fasullo had moved into the apartment and away from the door and were talking. He instructed Miss Lopera to sit on the couch and had Det. Fasullo make a quick check of the apartment for any other persons. There were no other persons in the apartment at that time and when Det. Fasullo returned to the living room the two officers handcuffed and searched the two male occupants, Mr. Baltazar and Mr. Tobon (Tr. 30, 35, 275–276). Detective Healy removed from Mr. Baltazar's coat pocket a driver's license, a car registration, and a social security card (Tr. 31, 35).

At this point, Detective Healy took from his wallet a printed form containing the Miranda warnings. Prior to reading the four arrestees their rights, Det. Healy asked them if they understood English. He found he could converse only with Alexandra Escobar who said she was attending a school here to learn English (Tr. 36, 40, 53, 208–209, 340). Since none of the detectives on the scene that night had any fluency in Spanish (Tr. 172–174), Detective Healy asked her if she would translate what he read to the other three arrestees. She nodded in agreement (Tr. 36, 39, 199–200, 207). Det. Healy then read separately each Miranda warning in English. After each such reading, he asked Miss Escobar if she understood what he had read; when she responded affirmatively, he asked her to translate and she spoke to the other three arrestees in Spanish (Tr. 35–41).

When this process was complete, Detective Healy took a closer look at the handbag sitting open on the coffee table and noticed that it contained "numerous bills, United States currency, and it seem[ed] like they were bundled with rubber bands around them" (Tr. 41). Detective Healy asked whose money this was and Miss Escobar responded in English that it was hers (Tr. 42, 339). In response to further questioning, she stated that the bag contained two hundred dollars ($200.00) intended for a vacation (Tr. 41–42). Upon looking further into the bag, he found a "world health vaccination card" bearing the name Beatrice Soccoro (phonetic) Lopera Tobon (Tr. 42–43). Det. Healy looked again through the handbag and found two United States postal receipts for registered mail sent to Colombia, which receipts also bore the name Beatrice Lopera and the address of the apartment he was in (Tr. 45–46). He also found in the handbag a writing pad which he "perused through and saw that there were amounts, figures and some names" and a black notebook which also contained figures and names (Tr. 47–48). The bag

---

6. See infra at pp. 28 & 29.

7. Detective Healy testified that at the time of his entry into the apartment he did not know if he was "followed by anybody into the apartment" (i. e., Det. Fasullo) (Tr. 199) and that he did not remember whether it had been "necessary to open the door further" to enable him to enter the apartment, although he "may have brushed the door going into the apartment" (Tr. 197).

also contained a Con Edison utility bill for the address 59–21 Calloway Street (Tr. 49–50). When Det. Healy ultimately counted the money from the handbag, it totalled six thousand and eighty-nine dollars ($6,089.00) (Tr. 51–52).

Detective Healy then proceeded to obtain the pedigrees (names, addresses, country of origin, and nationality of the individual arrestees. He spoke to Alexandra Escobar in English and to the other three in a combination of English and "pidgeon Spanish" (Tr. 52–59). He learned, *inter alia,* that Miss Lopera, who initially gave her name as Beatrice Gomez (Tr. 53, 61), lived at 59–21 Calloway Street, Apartment 4D in Queens.[8] Mr. Baltazar gave as his address Apartment 2D at 404 West 51st Street in Manhattan (Tr. 54, 269–270, 309) After each arrestee had given him a pedigree, Det. Healy asked them who lived in the apartment, "and no one of them admitted to living in the apartment," "the answer I got was that, we don't live here, that the addresses they have given was where they lived" (Tr. 56–57, 339). He then asked who Severinno Gutierrez was and Miss Lopera replied to the effect that he was a friend of hers by saying "amigo." When asked by Det. Healy and Miss Escobar where Severinno Gutierrez was, Miss Lopera shrugged her shoulders and said she did not know (Tr. 57, 174–176). When asked whether he knew Severinno Gutierrez, Mr. Baltazar indicated that he did not (Tr. 271). Detective Healy then proceeded to one or more other rooms of the apartment and seized other documents. Since the Government does not intend to introduce into evidence in its direct case any of Mr. Baltazar's statements or any items seized other than in the living room (Tr. 59–60), they are not proper subjects of a suppression motion at this juncture.

Detectives Healy and Fasullo had been in Apartment 6D approximately twenty-five to thirty minutes (Tr. 61, 241–242) when a buzzer in the apartment rang, indicating that somebody downstairs sought to gain entry to the building. Det. Healy pushed a button in the apartment, which momentarily unlocked the main doors to the building, and positioned himself by the front door of the apartment. Within a matter of minutes, there was a knocking on the door, which Det. Healy then opened, and Jesus Espinal entered the apartment (Tr. 61, 242–244). The officer identified himself to the newcomer who was carrying a bag containing hot food and who said he worked as a delivery boy for a restaurant and was delivering food to the apartment. Due to certain evasive, contradictory, and otherwise suspicious answers given by Mr. Espinal concerning his pedigree and other matters, Det. Healy informed Mr. Espinal that he was detaining him in order to allow immigration authorities to interview him (Tr. 62–71, 244–246). This exchange was held in English (Tr. 97).

Detective Healy returned to the area of the living room where the four arrestees had remained to tell them he was going to take them to the precinct house. At that point he noticed a triple beam scale lying on the floor beside "the far end [of the couch], the side of the couch that would be nearest Mr. Baltazar" (Tr. 72, 277). He also noticed a white plastic bag lying "[i]n front of the scale itself against the couch" (Tr. 81–85, 92–93, 99, 272–273, 276–277). It was "a shopping type plastic [bag]" and lay open. Det. Healy could see within it a strainer and a large plastic bottle (Tr. 82). He picked up the bottle since he could see it bore writing on its face and found that the label "had a name of a company and stuff and the main thing was that it was mannitol" (Tr. 84, 92). He then noticed in the plastic bag "a piece of white, like wax paper with a brown substance or dark substance" which, when he opened the wax paper, he recognized as marijuana (Tr. 84–85, 92). In addition, the plastic bag contained a box of "Baggies" plastic sandwich bags (Tr. 92–93).

---

**8.** When specifically asked, Miss Lopera disclaimed ownership of the world health organization card and remained silent when asked about the Con Edison bill, both of which were retrieved from the handbag (Tr. 58).

Detective Healy seized the scale and the white plastic bag and its contents as evidence and asked the arrestees "whether any of the items in the bag or the scale were theirs," to which he received no response (Tr. 93–94). He indicated to all present that the group would proceed to the precinct house when Det. Fasullo suggested that jewelry he had noticed lying in plain view in other rooms might not be safe in an unoccupied apartment. The jewelry was retrieved and, since it appeared to be woman's jewelry, it was offered to the female arrestees and accepted by Miss Escobar (Tr. 94–96). As he walked towards the front door, he noticed a ring lying on a table and, holding it up, said that whoever owned it should take it. Mr. Espinal stepped forward, claimed the ring as his own, and began putting the ring on his finger. When Det. Healy reminded Mr. Espinal that he had earlier stated that he had never been to the apartment before, Mr. Espinal "just laughed and he was placed under arrest also," the ring was seized as evidence, and Mr. Espinal was advised of his rights (Tr. 96–97, 100, 246–247).

The five arrestees were then taken downstairs and driven to the 114th Precinct (Tr. 100). Special Agent Richard K. Crawford of the Drug Enforcement Administration testified that he arrived at the 114th Precinct some time after ten o'clock that same evening and was met there by Detective Healy (Tr. 303). Speaking in Spanish, Agent Crawford then advised each arrestee individually of his or her rights[9] and obtained each one's personal history (Tr. 288, 292, 304–311, 314–317, 345). When Miss Lopera indicated she wished to go to the restroom, Agent Crawford searched her coat pockets and found "a piece of paper which indicated the purchase of an automobile from a used car dealership" (Tr. 311–312). The purchase agreement bore the same name as the car registration seized earlier from Mr. Baltazar's coat pocket (Tr. 313–314).

Agent Crawford also testified that he recognized Beatrice Lopera and Jose Manuel Baltazar as two individuals he had detained on a previous occasion (Tr. 147–148, 293, 309, 314–315, 361, 363). In early January of 1979, he had conducted a surveillance of a Luis Sanchez and certain other individuals in connection with a particular investigation. On January 4, 1979, he had tailed Mr. Sanchez and three other persons from a location in Queens to Pennsylvania Station in Manhattan where Mr. Sanchez placed a telephone call from the overseas telephone booths and where Agent Crawford observed Mr. Sanchez engage three other persons in conversation. After Mr. Sanchez and one of the persons he had been speaking with left the Penn Station area, he approached the two remaining individuals and detained them for brief questioning. They identified themselves as Beatrice Gomez Restrepo and Jose Manuel Baltazar. Agent Crawford did not arrest them (Tr. 130–147, 214, 314–317, 324, 327, 341–344, 352–360). Agent Crawford further testified that in October of 1978 he had "learned of the address of the building [in which the five defendants were arrested in March of 1979] in connection with a totally different investigation" but that prior to their arrest he had had no information relating to Apartment 6D (Tr. 151, 188–189, 213, 317–318, 323–324).

Detective Healy testified that during the month of January, 1979, he frequently saw Agent Crawford at the 114th Precinct and that during that month Agent Crawford related to him the observations made during the Penn Station surveillance. Det. Healy was already familiar with two of the individuals who had been tailed from Queens and he speculated that Agent Crawford had in fact learned of them from him. Det. Healy was given descriptions of the other persons tailed from Queens, but made no written notes of the conversation with Agent Crawford. Det. Healy was also told that two other individuals had been detained at Penn Station, but he testified that he could not remember any of the substance

9. For a translation of the *Miranda* warnings as given by Agent Crawford, see Tr. 331–332, 336–337.

of that exchange with Agent Crawford because "[a]t that time [he] wasn't at all interested in these other people" (Tr. 130–147). Det. Healy also testified that on the night of February 27, 1979, he was called to the 110th Precinct. DEA Group Five, of which Agent Crawford is a member, had in custody a person Det. Healy believed had information concerning the homicide he was investigating. On that occasion he mentioned to Agent Crawford or other members of the DEA Group that he had visited the Crescent Street address they had tipped him to, that he had found it abandoned but had learned or confirmed that one of the deceased had been a frequent visitor there. Det. Healy did not recall mentioning on that occasion the memo book or the 178th Street address found therein (Tr. 110–113).

Although two court reporters testified as to Miss Escobar's proficiency in the English language, that testimony and the sufficiency of the *Miranda* warnings given the four arrestees are not pertinent to the suppression motion at this juncture since the Government does not intend in its direct case to introduce into evidence any statements made by Mr. Baltazar. See *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

## II

### STATUS OF THE DEFENDANTS

After a lengthy suppression hearing, on May 25, 1979, Beatrice Lopera, who was in her last weeks of pregnancy, pleaded guilty to the indictment under a Rule 11 agreement whereby it was understood that the Government would recommend she be sentenced to time already served (and, of course, a special parole term as mandated by Title 21, United States Code Section 841(a)(1)) and that she would execute a voluntary departure form provided by the Immigration and Naturalization Service. A presentence report was prepared and on May 29, 1979, Miss Lopera was sentenced to time served and a lifetime special parole term. She was subsequently deported.

On May 25, 1979, the Government moved to dismiss the indictment against Alexandra Escobar, Jesus Espinal, and Luis Carlos Tobon Gonzalez on the condition that they too execute voluntary departure forms. Each of the three defendants agreed to execute such forms and the Court granted the Government's motions. Each of these defendants has since left the United States.

The indictment still stands against Jose Manuel Baltazar and on June 15, 1979 the Court heard oral argument on his motion to suppress. As previously noted, given the Government's representation as to what it will introduce in its direct case, we are concerned here with the cocaine, driver's license, car registration, and social security card seized from Mr. Baltazar's person; the brown leather handbag and its contents found on the coffee table in the living room of Apartment 6D; and the triple beam scale and the white plastic bag and its contents found lying on the living room floor beside the couch.

## III

### DEFENDANT'S STANDING TO MOVE TO SUPPRESS

In its Memorandum in Opposition to the Motion to Suppress at 10 ("Government's Memorandum") dated June 12, 1979, the Government questioned defendant Baltazar's standing to challenge the seizure of certain items seized in Apartment 6D.

It is a well settled principle of constitutional law (*Simmons v. United States,* 390 U.S. 377, at 389, 88 S.Ct. 967, at 974, 19 L.Ed.2d 1247 (1968)) that "rights assured by the Fourth Amendment are personal rights, and that they may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure. See, e. g., *Jones v. United States,* 362 U.S. 257, 260–261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697." As the Supreme Court noted in *Simmons, supra,* 390 U.S. at 389–390, 88 S.Ct. at 974, "[a]t one time a defendant who wished to assert a Fourth Amendment objection was required

to show that he was the owner or possessor of the seized property or that he had a possessory interest in the searched premises" (footnote omitted). The Supreme Court modified the aforestated rule in *Jones v. United States,* 362 U.S. 257, 261–267, 80 S.Ct. 725, 732–734, 4 L.Ed.2d 697 (1960), when it held alternatively: (i) that possession by a defendant of an item seized is sufficient to confer upon that defendant standing to challenge the constitutionality of the seizure when possession of the item is an element of the criminal offense with which he has been charged; and (ii) that anyone legitimately present on the premises searched has standing to move to suppress the fruits of that search.

In *Rakas v. Illinois,* 439 U.S. 128, at 133 and 139, 99 S.Ct. 421, at 425 and 428, 58 L.Ed.2d 387 (1978), the Court had "occasion to re-examine the 'standing' terminology emphasized in *Jones* " and favored a "[r]igorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of 'standing' . . . ." The Court modified the second alternative holding of *Jones, supra,* by holding (*Rakas, supra,* 439 U.S. at 143, 99 S.Ct. at 430) that a defendant who has "a legitimate expectation of privacy in the premises" searched can "claim the protection of the Fourth Amendment with respect to a governmental invasion of those premises." The Court explained that the status of a defendant as a guest, licensee, or invitee with respect to the premises searched is a factor in determining whether he has a legitimate or reasonable expectation of privacy but "ought not to control." *Id.*

■ Defendant has the burden of showing that he had either a reasonable expectation of privacy in Apartment 6D at 88–10 178th Street in Queens or that he had an interest in the property seized. *Rakas v. Illinois, supra,* 439 U.S. at 148–150, 99 S.Ct. at 433–434; *Simmons v. United States, supra,* 390 U.S. at 389–391, 88 S.Ct. at 974–975. There is no evidence to suggest that

Mr. Baltazar had any legitimate expectation of privacy in Apartment 6D on March 5, 1979. The evidence adduced at the suppression hearing revealed only that a Severinno Gutierrez had applied to lease Apartment 6D; that the building superintendent had a layout of the apartment in the building which had the name Gutierrez listed for that apartment; that the superintendent believed the apartment was "occupied" by two males and two females, all of whom he believe were Spanish-speaking and came from Colombia; that at the time of their arrest all five arrestees indicated it was not their apartment; and that Miss Lopera stated that Severinno Gutierrez was an "amigo." [10] This is insufficient to show any interest in the premises on the part of Mr. Baltazar such as would support a Fourth Amendment claim. Mr. Baltazar and his then co-defendants had ample opportunity to offer testimony or other evidence to establish a reasonable expectation of privacy without fear of self-incrimination at trial. *Brown v. United States,* 411 U.S. 223, at 228, 93 S.Ct. 1565, at 1569, 36 L.Ed.2d 208 (1973); *Simmons v. United States, supra,* 390 U.S. at 394, 88 S.Ct. at 976. Mr. Baltazar chose not to avail himself of that opportunity.

Therefore, the Court must inquire into what interest Mr. Baltazar had in the property seized in the living room of Apartment 6D on March 5, 1979. As noted earlier, in *Jones v. United States, supra,* 362 U.S. at 263–264, 80 S.Ct. at 732, the Supreme Court formulated an automatic standing rule whereby the "possession [of the evidence seized which] both convicts and confers standing, eliminates any necessity for a preliminary showing of an interest in the premises searched or the property seized." The Supreme Court did not review this holding in *Rakas v. Illinois, supra,* 439 U.S. at n. 4, 99 S.Ct. at n. 4:

"We have not yet had occasion to decide whether the automatic standing rule of *Jones* survives our decision in *Simmons*

---

10. Miss Escobar's silent acceptance of the jewelry tendered by Det. Healy for safe-keeping is not particularly conclusive.

v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). See Brown v. United States, 411 U.S. 223, 228–229, 93 S.Ct. 1565, 1568–1569, 36 L.Ed.2d 208 (1973). Such a rule is, of course, one which may allow a defendant to assert the Fourth Amendment rights of another." [11]

Therefore, despite the Supreme Court's own misgivings that the automatic standing rule of Jones may be inconsistent with the Court's more recent and repeated emphasis on the personal nature of Fourth Amendment rights, Rakas v. Illinois, supra; Brown v. United States, supra; Simmons v. United States, supra, this Court is constrained to apply that rule to the facts of this case.

■■■ Mr. Baltazar has been indicted for possession with intent to distribute cocaine. Clearly then, possession by him of the cocaine seized on March 5, 1979 is an element of the offense with which he is charged and, under the automatic standing doctrine, he has standing to move to challenge the legality of the seizure of that cocaine. This means that he may challenge not only the police action which immediately preceded the seizure, i. e., the search of his person, but the entire process leading up to that seizure, including Detective Healy's warrantless entry into the apartment, even though he showed no legitimate expectation of privacy therein. This is the lesson to be learned from the Supreme Court's decision in Brown v. United States, supra, 411 U.S. at 229–230, 93 S.Ct. at 1569, wherein petitioners who had no legitimate interest of any kind in the premises searched were denied recourse to the automatic standing rule because possession of the evidence at the time of the contested search was not an essential element of the offense charged.[12] It is questionable whether defendant's possessory interest in the documents seized from his coat pocket and his right to be secure in his person from unreasonable searches and seizures confer upon him anything more than standing to contest the body search; in light of our finding, discussed below, that Detective Healy's warrantless entry into Apartment 6D was justifiable and lawful, we need not resolve this particular issue. It is clear, however, from the foregoing analysis that Mr. Baltazar, who never claimed any possessory interest

11. See also n. 11 of the Rakas opinion. In Brown, supra, petitioners sought to avail themselves of the automatic standing doctrine of Jones; yet, the Court found (411 U.S. at 228, 93 S.Ct. at 1569) that "unlike Jones, the Government's case against petitioners does not depend on petitioners' possession of the seized evidence at the time of the contested search and seizure" (footnote omitted). Before reaching this conclusion, the Court noted (411 U.S. at 228, 93 S.Ct. at 1568–1569):

"The self-incrimination dilemma, so central to the Jones decision, can no longer occur under the prevailing interpretation of the Constitution. Subsequent to Jones, in Simmons v. United States, supra, we held that a prosecutor may not use against a defendant at trial any testimony given by that defendant at a pretrial hearing to establish standing to move to suppress evidence. 390 U.S., at 389–394, 88 S.Ct., at 973–976."

12. It occurs to this Court that a reconciliation might be achieved in this case between defendant's interest in the property seized and the Supreme Court's pronouncements on the personal nature of Fourth Amendment rights. If defendant were denied standing to contest Detective Healy's entry into or presence in an apartment in which defendant has no legitimate expectation of privacy, there would be no basis for the vicarious assertion of Fourth Amendment rights. See Rakas v. Illinois, supra, 439 U.S. at 133, 99 S.Ct. at 425, quoting from Alderman v. United States, 394 U.S. 165, at 174, 89 S.Ct. 961, at 966, 22 L.Ed.2d 176 (1969). Defendant would still have standing to object to the governmental intrusion which immediately preceded the seizure of the cocaine—in this instance, the search of his person—because the evidence reveals that he has a possessory interest in the property seized (and, in the peculiar facts of this case, because every individual has the requisite standing to challenge a search of his own person). Nor would such a holding by any means strip defendant of all meaningful protection under the Fourth Amendment. Although he would not be entitled to question the lawfulness of Detective Healy's presence in the apartment, he would still enjoy at least the same protection as a person in a public place who may not be searched absent a reasonable suspicion based upon specific and articulable facts. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). However, since the automatic standing doctrine of Jones has not been overruled or modified by the Supreme Court, defendant is entitled to the full benefit thereof.

in the other items found on the coffee table and the living room floor, has no standing to contest the lawfulness of their seizure since their possession is not an element of the offense charged in the indictment.

## IV

## DISCUSSION OF THE MERITS

In his Memorandum in Support of Motion to Suppress ("Defendant's Memorandum"), defendant advances two basic challenges to the manner in which the cocaine was discovered and seized; one is premised on a factual interpretation of the events leading up to the seizure, the other focuses on issues of law in the search and seizure area.

A. *Defendant's contention that the investigation of a potential homicide witness was a ruse to justify a premeditated search for which there was no probable cause.*

█ Defendant argues (Defendant's Memorandum at 11):

"The events as Officer Healey [sic] related them are not believable. Healey contends that he was at apartment 6D solely to conduct an interview with someone named Guitterez whom he knew nothing about. The facts would rather seem to indicate that through a tip it was discovered that there was cocaine in the apartment and that the officers went to the apartment for the purpose of seizing that cocaine. Both Healey and DEA lacked probable cause to obtain a search warrant so the ruse of investigating a potential homicide witness was developed."

The Court finds that the evidence presented at the suppression hearing does not support defendant's interpretation of the events. Although defendant raises this factual issue in connection with his analysis of the "clear view" exception to the warrant requirement and its corollary that discovery of the incriminating evidence seized be inadvertent, we deal with the issue here since a finding that law enforcement officers contrived to circumvent the probable cause and warrant requirements of the Fourth Amendment would be grounds for suppressing the fruits of a search conducted with or without a warrant. When reduced to its basic ingredients, defendant's argument is premised on a disregard for the fact of and need for close cooperation between law enforcement agencies and the difficulties facing law enforcement officers operating in a large metropolitan area inhabited in large part by non-English speaking minorities.

Defendant suggests (Defendant's Memorandum at 12) that "the fact that DEA Group 5 had had recent contact with two of the five defendants in regard to their cocaine investigations is too remarkable a coincidence not to make this entire search suspect." However, it is not surprising that persons inadvertently found in possession of a large amount of cocaine should have previously run afoul of an unrelated drug investigation conducted by a different law enforcement agency operating in the same general area. Nor is it in the least bit remarkable that members of Group Five of the DEA's New York Joint Task Force should convey to a New York City detective any information they feel may be useful to a double homicide investigation. Nor are the Court's suspicions aroused by the fact that the New York City Police Department handed this case over to the Drug Enforcement Administration. To the contrary, one might expect the case to have remained within the City's jurisdiction had Det. Healy or anyone else wished to cover up improper collusion with federal agents. The arrangement worked out by these law enforcement agencies betokens an administrative judgment as much as anything else.

Nor is the Court shocked to learn that Detective Healy, who speaks no Spanish, went to the 178th Street address to interview a potential homicide witness accompanied by three non-Spanish speaking detectives and posted the same in various positions in and around the building when he knew little more about the interviewee than his name and that he probably was Spanish-speaking. Detective Healy testified (Tr. 173):

"I learned [,] to speak from experience [,] that if there's a Spanish officer available I would take one along. If I don't have one we get along as best we can. Most of the time we get the job done. Between my pidgin Spanish and their pidgin English, we get it."

Throughout the suppression hearing, defense counsel suggested, if not argued, through their questioning of prosecution witnesses that neither Mr. Baltazar, nor Miss Lopera, nor any of the other defendants were sufficiently proficient in English to understand the *Miranda* warnings read to Miss Escobar by Det. Healy. If neither Mr. Baltazar nor Miss Lopera were in fact able to communicate in English and if in fact Det. Healy contrived to surprise these individuals, whom Agent Crawford had already encountered, in the middle of a drug transaction, it stands to reason that Det. Healy would have brought a Spanish-speaking officer with him *if one were available.* Nor is it remarkable that Det. Healy was accompanied by fellow officers whom he stationed in strategic locations or that he knocked on the door of the apartment rather than buzzing from downstairs. In light of the fact that he was investigating a four and a half month old double homicide, it is understandable that he should have taken every reasonable measure to prevent the disappearance of a potential witness, no matter how tenuous his connection with the crime may appear to the untrained observer.

Finally, defendant notes (Defendant's Memorandum at 10–12) how "convenient" it was that Mr. Baltazar should have given Det. Healy "the opportunity to see the white powder in the package" and that Det. Healy should have found so many other incriminating pieces of evidence in open view. Suffice it to say that the defendants never availed themselves of the opportunity to controvert Det. Healy's testimony that certain items seized were in plain view and that the body of law surrounding the "plain view" exception to the warrant clause is premised on the accidental discovery of incriminating evidence visible (though not necessarily obvious) to a passerby.

The Court finds, therefore, that there is no factual basis for this portion of defendant's claim.

### B. *Lawfulness of Detective Healy's entry, search and seizure.*

■ The Government contends (Government's Memorandum at 8) that Detective Healy's observations through the open door to Apartment 6D gave him probable cause to arrest defendant and that exigent circumstances justified his warrantless intrusion:

"Healy's observation of the plastic bag with white powder and of Baltazar's suspicious conduct provided him with probable cause to arrest Baltazar for a narcotics violation. *See United States v. Canieso,* 470 F.2d 1224, 1228 (2d Cir. 1972) (and cases cited therein at footnote 3); *United States v. Bravo,* 403 F.Supp. 297, 302 (S.D.N.Y.1975), *rev'd on other grounds sub nom., United States v. Armedo-Sarmiento,* 545 F.2d 783 (2d Cir. 1976).

"Healy also had authority to enter apartment 6D to arrest Baltazar for a crime Healy observed taking place. The police were not required to leave the building to obtain an arrest warrant, thereby allowing Baltazar an opportunity to flush the cocaine down the toilet. *See Chapman v. United States,* 365 U.S. 610, 615 [81 S.Ct. 776, 5 L.Ed.2d 828] (1961); *United States v. Montiell,* 526 F.2d 1008 (2d Cir. 1975)."

The evidence presented at the suppression hearing supports the Government's view that Detective Healy had probable cause to arrest Mr. Baltazar. Detective Healy's uncontroverted testimony reveals that he had a legitimate reason for seeking to interview the occupant of Apartment 6D; that as he stood outside the open door to the apartment he had an unobstructed view of Mr. Baltazar as the latter rose from the couch and retrieved from behind a leather bag on the coffee table a clear plastic bag containing a white powder, which bag Mr. Baltazar then secreted under his coat in the area of his left armpit. Thomas Healy is an

experienced law enforcement officer. He has served for twenty-two years in the New York Police Department, twelve or thirteen of those years as a detective. He testified that he has participated in approximately eighty to a hundred drug-related arrests, of which approximately half involved cocaine, and that in 1965 or 1966 he attended a three-week special training course in narcotics (Tr. 11–13, 23–24, 231).

In light of his experience and the fact that defendant's suspicious behavior occurred as or immediately after Detective Healy identified himself as a police officer, Detective Healy had good reason to believe that he had seen Mr. Baltazar hide cocaine on his person. The fact that Detective Healy so believed is borne out by his spontaneous declaration to Detective Fasullo to the effect "Joe, there's coke." Defendant's assertion (Defendant's Memorandum at 14) that for all Det. Healy knew the white powdery substance could have been "sugar in a 'baggy' " or "flour that Mrs. Jones was just about to bring in a plastic bag to her neighbor" is unpersuasive in that it fails to account for Mr. Baltazar's suspicious behavior. The Court finds, therefore, that, as he stood in the doorway of the apartment and made the observation recited above, Det. Healy had probable cause to arrest defendant on drug charges. Compare *Redmon v. United States*, 355 F.2d 407 (9th Cir. 1966), and *United States v. Devenere*, 332 F.2d 160 (2d Cir. 1964), cited in *United States v. Canieso*, 470 F.2d 1224, at n. 3 (2d Cir.

1972); *United States v. Bravo*, 403 F.Supp. 297 (S.D.N.Y.1975), *rev'd on other grounds sub nom., United States v. Armedo-Sarmiento*, 545 F.2d 783 (2d Cir. 1976).[13]

In two recent opinions, the Second Circuit Court of Appeals addressed the question of "whether and under what circumstances the Fourth Amendment permits federal law enforcement officers to enter a suspect's home in order to effect a felony arrest for which the officers have both statutory authority and probable cause but no warrant" (footnotes omitted),[14] *United States v. Reed*, 572 F.2d 412, at 417–418 (2d Cir. 1978). In *Reed, supra*, 572 F.2d at 423–424 the Second Circuit quoted the following passage from the District of Columbia Circuit's opinion in *Accarino v. United States*, 85 U.S.App.D.C. 394, 179 F.2d 456, 464 (D.C. Cir.1949), cited with approval in *Miller v. United States*, 357 U.S. 301, 311, 78 S.Ct. 1190, 1194, 2 L.Ed.2d 1332:

> "A man in his own home has a right of privacy which he does not have when on the public street. That additional right imposes additional requirements upon the power of arrest . . . . 'We emphasize that no matter who the officer is or what his mission, a government official cannot invade a private home, unless (1) a magistrate has authorized him to do so or (2) an immediate major crisis in the performance of duty affords neither time nor opportunity to apply to a magistrate.' "

**13.** The instant case is clearly distinguishable from the State court cases cited by defendant (Defendant's Memorandum at 17–18). In *People v. Oden*, 36 N.Y.2d 382, at 385, 368 N.Y. S.2d 508, 512 (1975), the New York Court of Appeals held that the mere passing of a glassine envelope of unascertainable contents in a known narcotics location viewed through binoculars, unsupplemented by any additional relevant behavior or circumstances, "was insufficient to raise the level of inference from suspicion to probable cause." In *People v. Nadel*, 55 A.D.2d 659, 390 N.Y.S.2d 131, 132–133 (2d Dept. 1976), a police officer, who conceded that almost half the one hundred narcotics arrests made by him had eventuated in negative laboratory tests of the substances seized, noticed a plastic bag containing a white powder protruding about an inch from the breast pocket of

defendant's shirt which bag he seized even though the defendant "did nothing affirmatively to arouse his suspicions." Citing the *Oden* decision, supra, the court held that defendant's arrest was illegal.

**14.** In n. 3 of the *Reed* opinion, the Court of Appeals outlined the statutory authority (21 U.S.C. § 801 *et seq.*) granting DEA agents certain enforcement powers but noted:

> "The central question presented by this case, of course, is not whether the agents had statutory authority to make probable cause arrests, nor is it whether the *method* of entry into Reed's apartment was within the agent's statutory powers; rather, the question is the constitutionality of the entry itself" (citations omitted).

Accordingly, the Second Circuit held (572 F.2d at 424) that

"in the absence of a warrant to arrest a suspect at home, and in the absence of exigent circumstances, federal law enforcement officers are prohibited by the Fourth Amendment from entering the home of a suspect to effect a felony arrest for which they otherwise have both statutory authority and probable cause" (footnote omitted).

Earlier, in *United States v. Jarvis*, 560 F.2d 494, at 498 (2d Cir. 1977), the Second Circuit joined four other Circuits in adopting criteria, first set forth in an *en banc* decision of the District of Columbia Circuit in *Dorman v. United States*, 435 F.2d 385, at 392 (1970), for determining the presence of "exigent circumstances":

"These criteria include commission of a grave offense, belief that the suspect is armed, probable cause to believe the suspect has committed the crime, suspicion that suspect is on the premises, likelihood of escape if delay ensues, and peaceful entry by the police."

The Second Circuit upheld the lawfulness of a warrantless arrest supported by probable cause and elaborated on the definition and effect of "exigent circumstances" in *United States v. Campbell*, 581 F.2d 22, at 25 (2d Cir. 1978), as follows:

"[t]he phrase 'exigent circumstances' refers generally to those situations in which law enforcement agents will be unable or unlikely to effectuate an arrest, search or seizure, for which probable cause exists, unless they act swiftly and, without seeking prior judicial authorization."

The court went on to discuss the "hot pursuit" exception to the warrant clause as a mere illustration of "exigent circumstances" and stated (581 F.2d at 25–26):

"The actual commission of a crime within a dwelling may also be sufficient to permit an immediate entry. Police who witness an attempted homicide or other crime of violence being committed by a person in his home need not delay entry while first obtaining a warrant, since to do so would only serve to tolerate the commission of the crime itself.

'When law enforcement officers have probable cause to believe that an offense is taking place in their presence and that the suspect is at that moment in possession of the evidence, exigent circumstances exist. Delay could cause the escape of the suspect or the destruction of the evidence.' *United States v. Watson*, 423 U.S. 411, 435, 96 S.Ct. 820, 833, 46 L.Ed.2d 598 (1976) (J. Marshall, dissenting).[4]

"[4] The passage from Justice Marshall's dissent in *Watson* obviously refers to an arrest in a public place, but the rationale seems equally applicable to that narrow category of cases in which a law enforcement officer, though not on the premises, becomes aware of an incipient or on-going crime within a dwelling. At that point, the officer would have probable cause to act, and the exigent circumstances of the situation would compel that he do so without first obtaining a warrant.

"In short, circumstances which, when viewed as of the time of entry, would lead a reasonable person to believe that unless an entry and arrest are made immediately the suspect may escape, destroy essential evidence or continue the commission of an on-going crime, represent exigencies of the type justifying immediate police action on probable cause without first obtaining a warrant. See *United States v. Santana, supra*, 427 U.S. [38] at 44, 96 S.Ct. 2406 [49 L.Ed.2d 300] (J. Stevens, concurring); *United States v. Titus*, 445 F.2d 577, 578 (2d Cir. 1971), quoting *Jones v. United States*, 357 U.S. 493, 499–500, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958)."

With reference to the criteria set forth by the Court of Appeals for this Circuit as particularly relevant to a determination of exigent circumstances, the record in this case reveals that Det. Healy had probable cause to believe that a person or persons then occupying Apartment 6D were trafficking in narcotics. The Second Circuit has itself taken note of the gravity of such an offense in view of the fact that drug abuse and drug addiction have reached epidemic proportions in the New York City metropolitan area. *Carmona v. Ward*, 576

F.2d 405 (1978). While it is conceivable that Det. Healy or his fellow detectives could have prevented any of the four occupants of Apartment 6D from fleeing the premises while one of them sought to obtain a search warrant,[15] they could not in the interim have taken any reasonable measures to prevent the suspects from disposing of the cocaine. The need for immediate action was apparent. Detective Healy's warrantless entry into Apartment 6D to make an arrest based on probable cause not only was justified under the exigent circumstances but in this Court's view was the only reasonable method of fulfilling his sworn duty as a law enforcement officer in the premises.

█ Even if a court were to find that Detective Healy did not have probable cause to arrest Mr. Baltazar when he observed the latter hide what appeared to be contraband inside his jacket, the evidence clearly establishes that Detective Healy's observations gave him an adequate basis to search Mr. Baltazar's person. Given such basis to search, the detective's warrantless entry into the apartment was justifiable in the presence of exigent circumstances under the same line of reasoning discussed earlier in connection with probable cause to arrest, especially since the scope of the search of defendant's person was no more intrusive than was warranted by the detective's observations. See *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1976), and *McDonald v. United States*, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948), where the Supreme Court found warrantless searches of a trunk and a boarding house room, respectively, unlawful in the absence of any exigent or exceptional circumstances. See also *United States v. Blair*, 366 F.Supp. 1036, at 1039 (S.D.N.Y. 1973), wherein the court held that "[t]he exigent circumstances exception applies and permits government agents to make warrantless searches where contraband is 'threatened with imminent removal or destruction.'"

█ Under this alternative holding, Detective Healy's search of the defendant confirmed his earlier brief observation of the glassine bag and its contents, giving him probable cause to arrest Mr. Baltazar. Consequently, under either alternative holding, the driver's license, car registration, and social security card taken from defendant's coat pocket were seized pursuant to a search incident to a lawful arrest. Furthermore even if Mr. Baltazar had standing to challenge the seizure of the brown leather handbag and its contents, the triple beam scale, and the white plastic bag and its contents, their seizure would be justifiable under the "plain view" exception to the warrant clause since they were clearly visible to someone standing in the living room, Detective Healy was lawfully on the premises, their discovery by him was inadvertent and their incriminating nature was immediately apparent. *Coolidge v. New Hampshire*, 403 U.S. 443, at 466–470, 91 S.Ct. 2022, at 2038–2040, 29 L.Ed.2d 564 (1971); *United States v. Berenguer*, 562 F.2d 206, at 210 (2d Cir. 1977).

Accordingly, defendant's motion to suppress the cocaine and the documents seized from his person, as well as the brown leather handbag and its contents, the triple beam scale, and the white plastic bag and its contents must be, and the same hereby is, denied.

SO ORDERED.

---

15. Even such a temporary detention to allow time for the issuance of a search or arrest warrant might, arguably, have constituted a warrantless arrest.